## A89A1420. BARBER v. PERDUE.
### (390 SE2d 234)

BEASLEY, Judge.

Appellant Jack McWhorter "Mac" Barber filed a lawsuit against appellee Tom Perdue, a former administrative aide to the governor, alleging that Perdue had libeled and slandered Barber. This appeal follows the grant of summary judgment to Perdue.

The alleged libel was contained in a letter sent out by Perdue at the beginning of August 1986 to approximately 350 various city and county officials throughout Georgia during the 1986 political campaign for a seat on the Public Service Commission. Appellant had resigned from the PSC seat in February 1985 and then qualified to run in the 1986 election against Gary Andrews, a recent appointee to the position from which Barber had resigned. In July 1986, an Andrews press conference was held at which certain public documents from an investigative file on Mac Barber were released. Shortly thereafter Perdue sent the letter, as follows, on plain stationery with his home address:

> Lately, I have called on you often to ask for your assistance, and there is no way to really express in a letter my appreciation for the consideration and response you have provided. Now, once again, I must ask for your help.
>
> A year and a half ago, a Public Service Commissioner betrayed the public trust and tarnished his own reputation and, indirectly, that of all public officials by accepting what amounted to a bribe. When confronted with the fact that the Attorney General and the Georgia Bureau of Investigation had this information and were about to seek a felony indictment, Mac Barber chose to resign his office rather than face the prospect of indictment and conviction. The trucking company official who gave Mac Barber the money was convicted and fined a total of $12,000.00!
>
> This situation has occurred twice since Governor Harris has been in office. The first official was, as you remember, Sam Caldwell, who also betrayed the public trust and later was convicted of defrauding the state. Under pressure, he resigned as Labor Commissioner. To my way of thinking, Mac Barber and Sam Caldwell are two of the biggest embarrassments that state government has ever suffered.
>
> As specified by the State Constitution, when these va-

cancies occurred, Governor Harris was required to make appointments to fill them. In the case of the Labor Commissioner, the Governor appointed Joe Tanner, and in the case of the Public Service Commissioner, he appointed Gary Andrews. In contrast to their predecessors, these two men epitomize what a public servant should be. They have integrity and character and stand for what is right, good, and fair. While managing the responsibilities of their jobs, they also have had to rebuild the public trust and confidence Mac Barber and Sam Caldwell destroyed in those positions and in state government.

My request of you at this time is that you please do everything you possibly can during the last week of the campaign to make sure that Gary Andrews and Joe Tanner are elected. The people of Georgia deserve officials they can trust and honesty in state government.

The alleged slander consisted of Perdue's comments to an Albany newspaper reporter along the same lines as the letter.

"A libel is a false and malicious defamation of another, expressed in print . . . , tending to injure the reputation of the person and exposing him to public hatred, contempt, or ridicule." OCGA § 51-5-1 (a). "Libel per se consists of a charge that one is guilty of a crime, dishonesty or immorality. [Cit.]" *Grayson v. Savannah News-Press*, 110 Ga. App. 561, 566 (139 SE2d 347) (1964). "Slander or oral defamation consists in: (1) Imputing to another a crime punishable by law . . . ." OCGA § 51-5-4 (a). Bribery is such a crime. OCGA § 16-10-2.

Appellant concedes, for purposes of this action, that he is a "public figure" who is prohibited "from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times v. Sullivan*, 376 U. S. 254, 279-280 (84 SC 710, 11 LE2d 686) (1964). Inasmuch as the First Amendment mandates that a public figure plaintiff prove actual malice by clear and convincing evidence (id. at 285-286; *Harte-Hanks Communications v. Connaughton*, ___ U. S. ___ (109 SC 2678, 105 LE2d 562) (57 LW 4846) (1989); *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 52 (230 SE2d 45) (1976)), "a court ruling on a motion for summary judgment [in such a case] must be guided by the *New York Times* 'clear and convincing' evidentiary standard in determining whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 257 (106 SC 2505, 91 LE2d 202) (1986).

The case is not ripe for summary judgment in favor of defendant as the moving party. The four-volume record shows that there are material factual disputes which are relevant to the issue of knowledge or at least reckless disregard, which themselves are material to the pivotal issue of actual malice in the promulgator's issuance of the statements.

In deciding motions for summary judgment, our rule is the same under OCGA § 9-11-56 as is the rule under FRCP 56. The Supreme Court framed it: "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Adickes [v. S. H. Kress & Co.]*, 398 US [144], at 158-159. . . ." *Anderson*, supra at 255, *Eiberger v. West*, 247 Ga. 767 (281 SE2d 148) (1981); *Burnette Ford v. Hayes*, 227 Ga. 551 (181 SE2d 866) (1971). The question of law before us is whether, in this posture, viewing all the direct and circumstantial evidence and reasonable inferences in plaintiff's favor, a jury could find by clear and convincing evidence that defendant sent the letter or made any of the untrue statements " 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " *Anderson*, supra at 244, quoting *New York Times Co. v. Sullivan*, 376 U. S. 254, 279-280, supra. Such would constitute the element of actual malice which is an ingredient of a defamation case of this type.

Although "clear and convincing" is a more stringent standard than "preponderating" and requires a greater quantum and a high quality of proof in plaintiff's favor, *Anderson*, supra at 254, it has been recognized that proof of actual malice "does not readily lend itself to summary disposition," *Hutchinson v. Proxmire*, 443 U. S. 111, 120, n. 9 (99 SC 2675, 61 LE2d 411) (1979). See Wright, Miller & Kane, Federal Practice & Procedure: Civil 2d, § 2730, pages 240-245. This is because, as said in *Hutchinson*, proof of actual malice "calls a defendant's mind into question." Proof of state of mind "could be in the form of objective circumstances from which the ultimate fact could be inferred" as well as direct evidence from defendant. *Herbert v. Lando*, 441 U. S. 153, 160 (99 SC 1635, 60 LE2d 115) (1979). Because of the very nature of this element of the tort, *Herbert* pointed out that "[c]ourts have traditionally admitted any direct or indirect evidence relevant to the state of mind of the defendant and necessary to defeat a conditional privilege or enhance damages." Id. at 165. Evidence of motive may bear a relation to the actual malice inquiry. *Harte-Hanks Communications*, supra, 57 LW at 4849.

Because of the opportunities for having or obtaining, from objective sources, a knowledge of the true facts prior to publication of the statements, which on their face were libelous if not true, OCGA § 51-5-4 (a), defendant has not conclusively eliminated a finding of actual malice which finding is based on clear and convincing evidence. Much

of what is in dispute depends, for its resolution, on the credibility of witnesses. Defendant's own denial of actual malice is not conclusive in the presence of evidence to the contrary. *St. Amant v. Thompson*, 390 U. S. 727, 732 (88 SC 1323, 20 LE2d 262, 268) (1968). Not only direct evidence, but circumstantial evidence and reasonable inferences, are for a factfinder's sifting. *Harte-Hanks Communications*, supra, as illustrative.

That is outside of our circumscribed function as an appellate court, *Guye v. Home Indem. Co.*, 241 Ga. 213 (244 SE2d 864) (1978), and was so for the trial court. OCGA §§ 24-9-80; 9-11-56. As the Supreme Court reiterated in the *Anderson* summary judgment case, supra at 255: "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment. . . ."

There is evidence that defendant did not personally check the facts in the letter before sending them out from his home under the weight of his signature, knowing that he was identified as the governor's administrative aide. He deposed that he reviewed the GBI file, which contained contrary information which at the least could be inferred that defendant "entertained serious doubts as to the truth of his publication." *St. Amant*, supra at 731. Nevertheless, he instructed an assistant counsel to compare what was said in the letter only with what was in the law department's summary memo. Defendant knew from the GBI file, or did not seek to verify otherwise, that the trucking company official's sentence was for an incident not involving Barber. If he knew this to be true, a jury could infer that its inclusion in the letter about Barber was a deliberate implication that Barber's guilt, though not established by conviction, was a confirmed fact or at least a foregone conclusion upon which the letter recipients could rely in acting.

In addition, the law department memo itself stated that the official pleaded nolo contendere and was given first offender status; it was not a conviction, not a finding of guilt. Yet the jury could find that the letter-writer's statement clearly implied that the official was guilty as a matter of law, and that he parlayed this as fact to verify the guilt of plaintiff in the same transaction.

In addition, there is undisputed evidence that defendant knew that plaintiff had not been convicted or even indicted for bribery, yet stated that he was guilty of it. A jury can reasonably infer that he stated his opinion as though it were an official fact, despite the accusation's not having been proved beyond a reasonable doubt in a court of law. Adding the words "what amounted to" does not detract from the direct statement that Barber accepted a bribe, for it can reasonably be construed to mean only that it was ostensibly given for another

purpose. Whether Barber would have been convicted or not is fraught with the imprecision of the application of the bribery law, OCGA § 16-10-2, in "campaign contribution" cases, as illustrated by the recent case of *State v. Agan*, 259 Ga. 541 (384 SE2d 863) (1989).

The letter also states that the reason Barber resigned was that he chose resignation rather than indictment "and conviction," as though conviction were a certainty. Defendant had no basis on which to draw such an unqualified conclusion regarding conviction. Also, there is evidence that the reason for resignation was otherwise and that he did not know what motivated Barber to resign. Yet a jury could find that the author of the letter implied that resignation was attributable to an acknowledgment of guilt, despite Barber's denial to this day of any wrongdoing. This statement, too, was used in the letter to verify the truth of the statement that Barber had accepted a bribe.

The state law department memorandum does not conclusively establish the facts as a matter of law. It contains the results of investigation, made for the purpose of possible prosecution; what it states as facts were never tested in a court of law and many of them remain in dispute in this separate civil case, as is apparent from plaintiff's evidence. The latter, for one thing, weaves other assertions of fact into the outline to give what plaintiff contends to be a more complete picture.

Among the objective undisputed facts which have a bearing on the issue of actual malice are that defendant had access to the true facts, that this action was taken by defendant in an effort to discredit plaintiff as one who should be returned again to the state's Public Service Commission, that it was done in the heat of political campaign, that it was directed to local officials to influence them, that it was done with an assessment that it would have an impact on significant numbers of votes, that it was accomplished not as an official act but as a personal communication outside the governor's office. Disputed was whether defendant knew of the doubts which the GBI and the attorney general and law department had.

The subtlety inherent in ascertaining a person's state of mind, and the nuances discernible from objective and not only subjective evidence, in this case where plaintiff has come forth with disputing evidence on material facts about what defendant knew and upon what basis he acted, where plaintiff does not rely on the pleadings or only on the proposition that the jury might disbelieve the defendant's denial of legal malice, see *Anderson*, supra at 256, required the trial court to deny the motion for summary judgment.

*Judgment reversed. Carley, C. J., Deen, P. J., Banke, P. J., and Pope, J., concur. Deen, P. J., also concurs specially. McMurray, P. J., Birdsong, Sognier and Benham, JJ., dissent.*

DEEN, Presiding Judge, concurring specially.

While concurring fully with the majority opinion, I add the following comments.

"The privilege of poisoning one's enemy is not a thing of value," *Foster v. State*, 8 Ga. App. 119, 123 (68 SE 739) (1910), but it may be a constitutional right, even where the poisoning is verbal, vociferous, and vexatious, and the victim is a public figure. However, notwithstanding the liberties afforded in the course of political zeal and public debate about public figures, poison falsely served with actual malice is still actionable. A factual issue exists over the determinative question of actual malice in the instant case.

"Malice in the constitutional sense is distinguished from the common law sense of ill will, hatred, or 'charges calculated to injure' . . . Constitutional malice does not involve the motives of the speaker or publisher, though they may be wrong, but rather it is his awareness of actual or probable falsity, or his *reckless disregard* for their falsity." *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 55-56 (230 SE2d 45) (1976). (Emphasis supplied.) Our Georgia rule has been amended or modified to the extent that now a mini, modicum, or moderate amount of evidence concerning motive, which specifically bears a relationship to the actual malice inquiry, may be considered. *Harte-Hanks Communications v. Connaughton*, ___ U. S. ___ (109 SC 2678, 105 LE2d 562) (57 LW 4846) (1989). In the instant case, it was uncontroverted that Perdue intended to injure Barber's reputation; it is all apparent from his acts of affirmative action in seeking assistance of the attorney general in formulating part of the letter, and having the governor's press secretary edit the letter, that he was deleterious, dedicated, and deliberate in designing his attack on Barber's integrity, impartiality, image, and independence. The head of the special prosecution division stated in his deposition (albeit 16 months after the letter was published) that it would be dangerous to send out this type letter. He explained his use of the word "dangerous" as meaning there was a potential for a lawsuit.

That desire, deliberation, and design to injure, alone, would not suffice to prove libel or slander of a public figure. However, I believe that, considering facts such as the conspicuous juxtaposition of Perdue's (a) accusation of Barber accepting a bribe with (b) the factually misleading statement that "[t]he trucking company official who gave Mac Barber the money was convicted and fined a total of $12,000.00," along with (c) Perdue's statement to Barber regarding Barber's intention to run for re-election to the Public Service Commission, "We could sure use that seat," combined with admissions as to his letter being intended to brand Barber as a "crook" and in the "same category as Sam Caldwell," see *Jordan v. Hancock*, 91 Ga. App. 467 (86 SE2d 11) (1955) (liar, crook, thief, and cheat); *Stone v. McMichen*,

186 Ga. App. 510 (367 SE2d 839) (1988) (crook and thief), Perdue misplaced his calculations and confidence in his cleverness and crossed over the line into constitutional malice. Implicit in the juxtaposition noted above is the representation that the trucking official was convicted of bribing Barber, which Perdue knew to be false or *would have known absent a reckless disregard for the truth.*

The dissent relies on *Hustler Magazine v. Falwell,* 485 U. S. 46, 53 (108 SC 876, 99 LE2d 41) (1988). Language used in this cited case suggested that Falwell is a public figure, and his first sexual experience was incest with his mother in an outhouse. These expressions, made in a sexual context, are about on par, or possibly stronger and more unsavory, than the letter sent out to some 350 city and county officials, done in a political context, in the instant case. The distinction, difference, and distinguishing discernment in the two being, the former made in a magazine, was labeled a "parody" and was facetious, felicitous, fanciful, and fictional, while the latter letter is sent out as, and in, a staunchly serious sophisticated scenario. While acknowledging that debate on public issues about public figures should not be curtailed or inhibited, the defense by a private citizen or an elected public official, be he legislator, judge, governor, or other public servant, who is called a "crook," or is labeled guilty of violating our criminal code or of committing a crime, should likewise not be curtailed, chilled, censored, or shortchanged in seeking a jury trial in his challenge in the courts of our state to arrive at truth in the matter where factual matters are in dispute as to actual malice. In this situation, "[i]t would be monstrous to suppose that the arm of the Judiciary of Georgia was too short, or too weak, to reach and relieve. . . ." *Rogers v. Atkinson,* 1 Ga. 12, 25 (1846). Admittedly, this is a case which depends in large part on how one views the circumstances, but there are enough circumstances here for the jury to be doing the viewing regarding the correct viewpoint or point of view under existing law.

BENHAM, Judge, dissenting.

Because I cannot agree with the majority's holding that appellant has shown by "clear and convincing evidence" that appellee acted with actual malice, I must dissent.

Appellant maintains that appellee had the requisite actual malice because appellee knew the letter was false or recklessly disregarded the true facts. The facts, as memorialized in a ten-page memorandum by the head of the special prosecution division of the State Law Department who summarized the investigative file of the Georgia Bureau of Investigation, are as follows: On August 24, 1984, two trucking officials whose company's application for a certificate amendment had been denied by a PSC hearing officer, obtained $800 each from their

personal checking accounts and went to Barber's office where each gave him four $100 bills in an envelope bearing the donor's return address. They then discussed the hearing officer's decision and the appellate process. Barber filed campaign financial disclosure reports in August and October 1984 that did not reflect the receipt of the $800 from the trucking officials. Four days after the visit to Barber, one of the trucking officials visited another PSC commissioner who refused the official's offer of money. The commissioner mentioned the attempted bribe at a subsequent meeting of all the PSC commissioners. Ten days after receiving the money, Barber called the official who had contacted the other commissioner and told him to stay away from that commissioner. In November 1984, after Barber visited the Georgia Attorney General and reported he had $1,000 in cash that had been given to him as a campaign contribution, GBI agents and the head of the State Law Department's special prosecution division visited Barber who told them of the trucking officials' visit; stated he had no recollection of receiving money from them in 1984 but thought he might have since they had given him money in 1982; and denied that he had talked with anyone about the officials' PSC case. He later admitted that he had spoken with the trucking firm's attorney about the case. Barber later gave to the GBI the $800 in cash, in the original envelopes, stating he had no recollection of a 1984 contribution from the trucking officials. On November 29, 1984, Barber filed an amended campaign financial disclosure report that reflected the receipt of $800 from the trucking officials. In February 1985, the Attorney General informed Barber and his attorneys that he intended to present to the Fulton County Grand Jury a proposed indictment charging Barber with bribery, but would forego that action if Barber resigned from his office. Ten days later Barber resigned and the Attorney General agreed to make no presentment to the grand jury concerning the $800 payment by the trucking officials to Barber. The following day, the trucking officials were charged in an indictment with bribery. (While the memo does not make the distinction, other documents in the GBI file on the PSC investigtion reflect that the trucking officials were indicted for attempting to bribe two other members of the PSC, not appellant.) One official pled nolo contendere to one count and was given a one-year sentence, suspended upon the payment of a $10,000 fine and restitution of $2,000. Charges against the other trucking official were dropped. The $800 was returned to the trucking officials.

The following facts are discerned from various depositions given and affidavits executed in this matter. In February 1985, the Attorney General, in the presence of appellee and the head of the special prosecution division, briefed the governor on the investigation and informed him that there was sufficient evidence to present to a grand

jury. The Attorney General expressed his desire to give Barber the opportunity to resign in exchange for the Attorney General's decision not to seek an indictment. Since the Attorney General had presentments prepared, the governor believed that the evidence seemed more than sufficient to seek an indictment. In his affidavit, appellee Perdue swore he heard the Attorney General tell the governor that he considered the case against Barber to be strong and conviction likely, and that the governor concurred that the evidence was more than sufficient to seek an indictment. In a deposition, Perdue recalled the Attorney General saying that the evidence that Barber had taken a bribe was overwhelming. No other attendee of the meeting recalls the Attorney General discussing the likelihood of conviction. Two days after the governor's meeting with the Attorney General, Perdue talked with Phil Peters, the Director of the GBI, who, according to Perdue, opined that Barber had taken a bribe. According to his affidavit and deposition, Perdue, while preparing the letter now at issue, reviewed the GBI file on Barber, particularly the file summary memo, although he did not read every page contained in the file. He telephonically sought the assistance of the Attorney General on the "technical" aspects of the letter's second paragraph. In his deposition, the Attorney General confirmed that Perdue had called him, and recalled that Perdue wanted to ensure that he was accurately characterizing what had transpired with Barber. Perdue swore he made the changes suggested by the Attorney General, and gave the letter to the governor's press secretary in order that she might edit it. In an effort to ensure that the letter "tracked" the GBI file accurately, Perdue asked the press secretary to give the letter to the governor's assistant legal counsel for his review and opinion. Perdue swore that the press secretary told him that the legal counsel had compared the letter to the GBI file and had opined that it was consistent with the GBI file and the file summary memo. The press secretary testified that she proofread the draft and, at Perdue's request, gave it to the governor's assistant legal counsel for review to ensure the letter was consistent with the GBI file. The assistant legal counsel informed her that he had reviewed the letter and found it to be consistent with the file and the file summary memo, which information she relayed to Perdue. The assistant legal counsel executed an affidavit in which he stated that he had reviewed the letter and had concluded that the representations made therein concerning Barber were consistent with the file summary memo and the file.

Concerning the contents of the letter, Perdue acknowledged that he knew when he wrote the letter that Barber had not been charged with bribery. The assistant legal counsel acknowledged that he knew at the time he reviewed the letter that the trucking official had never been charged with bribing Barber. The Attorney General testified

that the second sentence of the second paragraph was accurate with the qualification that one is never sure of an indictment or a conviction. After studying the third sentence of the second paragraph, the Attorney General pointed out an inaccuracy in that the trucking official, having pled nolo contendere, had not been convicted. He did agree that it would be "natural and normal" to infer from the letter that the trucking official had been convicted and fined for bribing Barber, which inference was factually incorrect. The assistant legal counsel also acknowledged that a reasonable man could have inferred that the third sentence of the second paragraph referred to a conviction for bribing Barber. The head of the special prosecution division testified that while he thought it was "dangerous" to write a letter saying that Barber had accepted a bribe, such a letter would be accurate. He agreed that the third sentence of the second paragraph could be interpreted as saying that the official gave Barber money and was convicted for that action. Concerning the reference to Sam Caldwell, Perdue testified that he believed both Caldwell and Barber had betrayed the public trust and embarrassed state government. The Attorney General testified that he would not have made a comparison of Barber with Caldwell.

In support of his contention that Perdue acted with actual malice, appellant questions Perdue's motives in authoring and publishing the letter. Perdue swore that he had no personal malice or animosity for appellant. "[I]n the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment. In *Garrison v. Louisiana*, 379 U. S. 64 (85 SC 209, 13 LE2d 125) (1964), [the U. S. Supreme Court] held that even when a speaker or writer is motivated by hatred or ill-will his expression was protected by the First Amendment: 'Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth.' Id., at 73. Thus, while such a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures." *Hustler Magazine v. Falwell*, 485 U. S. 46, 53 (108 SC 876, 99 LE2d 41) (1988). "Constitutional malice does not involve the motives of the speaker or publisher, though they may be wrong. . . ." *Williams v. Trust Co.*, 140 Ga. App. 49, 56 (230 SE2d 45) (1976).

Appellant also finds actual malice in Perdue's failure to investigate. "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the

truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson*, 390 U. S. 727, 731 (88 SC 1323, 20 LE2d 262) (1968). In both his affidavit and his deposition, Perdue remains constant on the point that he believed the accuracy of the facts as he stated them in the letter, and continues to believe them. While appellee cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true" (*St. Amant v. Thompson*, supra, at 732), appellant has failed to present clear and convincing evidence of reckless disregard on appellee's part, i.e., that appellee entertained serious doubts as to the truth of his publication. Id. at 731. "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." *St. Amant v. Thompson*, supra at 732. Without determining whether appellee's statements were true, I must conclude that inasmuch as appellant failed to prove with clear and convincing evidence that appellee published the material with actual malice, this court should affirm the judgment of the trial court.

In its reliance on inferences based on circumstantial evidence, the majority loses sight of the standard of proof it espoused at the outset of its opinion: actual malice must be proved by clear and convincing evidence. The "objective undisputed facts" which the majority holds out as having a bearing on the issue of malice are not so objective as is asserted. Most of those "objective facts" show only that the events giving rise to this action were political in nature. I am not ready to assert that the fact that speech occurs in the context of political activity, that it is intended to discredit a candidate for office to whom the speaker is politically opposed, that the communication is on a private letterhead, and that it was made for the purpose of influencing votes is evidence of actual malice. Such a holding, which is what the majority advances, would seriously inhibit the heretofore uninhibited give-and-take which is inherent in the political process in this country. The majority's insistence that appellee had access to the "true facts" is inconsistent with its characterization of the matters asserted by appellee as untested in court: the "true facts" relied on by the majority are largely from the same sources relied on by appellee and were no more validated by a court than were the "facts" relied upon by appellee.

The libel laws of this nation, as applied to public figures such as appellant, do not require that the speaker be correct in his assertions, only that such misstatements as may be made are made without actual malice. Appellee put forth undisputed evidence that he did not

act with actual malice. The cases cited by the majority require that a plaintiff bear a heavy burden in order to show actual malice on the part of one who takes part in the spirited debate which characterizes this country's political and governmental processes. Appellant did not bear that burden. A web of inferences, in the face of direct evidence to the contrary, simply does not rise to the level of clear and convincing evidence. The trial court was correct in granting summary judgment to appellee, and I would affirm that judgment.

I am authorized to state that Presiding Judge McMurray, Judge Birdsong, and Judge Sognier join in this dissent.

DECIDED DECEMBER 20, 1989 —
REHEARING DENIED JANUARY 23, 1990 —

*James A. Mackay, Cook & Palmour, Bobby Lee Cook,* for appellant.

*Chilivis & Grindler, Nickolas P. Chilivis, Gary G. Grindler, Glass, McCullough, Sherrill & Harrold, Robert S. Jones, L. James Weil, Jr., Hull, Towill, Norman & Barrett, David E. Hudson,* for appellee.