## 36611. COX ENTERPRISES, INC. v. CARROLL CITY/COUNTY HOSPITAL AUTHORITY.

HILL, Presiding Justice.

On April 29, 1976, Cox Enterprises, Inc., d/b/a Atlanta Newspapers (hereinafter the "Newspaper"), published an article in *The Atlanta Journal* entitled "Tanner Hospital In Trouble, Critics Say." The article contained charges that mismanagement of Tanner Memorial Hospital had resulted in economic difficulties and in serious deficiencies in the provision of health care for patients; e.g., insufficient number of nurses, inoperative equipment, wasteful expenditures, financial deficits and needs for tax increases. In addition, the article contained phrases such as "fear for the [patients'] safety," "doctors are losing faith" and "earmarks of [financial] disaster."

Tanner Memorial Hospital is operated by the Carroll City/County Hospital Authority (the "Authority"). In March, 1977, the Authority filed a complaint alleging libel against the Newspaper in which the Authority charged that the article was "false and malicious defamation" and that it was published "willfully and maliciously and without regard to the true facts" and "in careless disregard of the true facts," and that the Newspaper has refused to retract the article. The Authority sought general damages of $250,000 and punitive damages of $250,000. No individual plaintiffs joined in the complaint. The Newspaper answered, denying the material allegations of the complaint (other than the publication of the article) including those relating to jurisdiction and venue. The Court of Appeals affirmed the grant of summary judgment to the Newspaper on the ground of improper venue; on certiorari this court reversed. *Carroll City/County Hospital Auth. v. Cox Enterprises, Inc.,* 147 Ga. App. 863 (250 SE2d 550) (1978); reversed, 243 Ga. 760 (1979).

On remand, the trial court considered the remaining portions of the Newspaper's motion for summary judgment, denied the motion and certified its order. The Newspaper then filed an application for interlocutory appeal which was granted by this court. Our

jurisdiction is based upon the construction of the freedom of speech and press provisions of the First Amendment to the Constitution of the United States (Code Ann. § 1-801).

The Newspaper asserts a number of reasons why its motion for summary judgment should have been granted. First among them is that to allow the Authority, allegedly a governmental entity, to sue for libel would contravene the First Amendment to the United States Constitution.

We note at the outset that we do not deal here with the so-called "clear and present danger doctrine," that is, with the power of government to punish speech that incites violent or illegal conduct. See Brandenburg v. Ohio, 395 U. S. 444, 447 (89 SC 1827, 23 LE2d 430) (1969); *State of Ga. v. Davis,* 246 Ga. 761 (1980); Tribe, American Constitutional Law, §§ 12-10, 12-11 (1978). Rather we deal with the power of government, in the absence of such incitement, to obtain damages from its critics, be they individual citizens or the press, and thereby to deter other critics.

We start from the seldom used but well founded rule: Governments and governmental entities cannot maintain an action for libel. "Criticism of government is at the very center of the constitutionally protected area of free discussion." Rosenblatt v. Baer, 383 U. S. 75, 85 (86 SC 669, 15 LE2d 597) (1966). No case has been found allowing a government to recover for libel. "For good reason, 'no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.' " New York Times Co. v. Sullivan, 376 U. S. 254, 291 (84 SC 710, 11 LE2d 686) (1964), quoting City of Chicago v. Tribune Co., 307 Ill. 595, 601 (139 NE 86, 88) (1923).[1] In the course of its decision in New York Times Co. v. Sullivan, supra, the Court found unconstitutional the Sedition Act of 1798 (which expired in 1801) which made it a crime for any person to "write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States . . . the Congress . . . or the President . . . with intent to defame. . . "

---

[1] The cases are collected at Anno., Right of Governmental Entity to Maintain Action for Defamation, 45 ALR3d 1315 (1972). The annotator found (45 ALR3d 1315): "The few cases which have considered this point have unanimously concluded that a governmental entity, by reason of its nature as a governmental entity, cannot maintain an action for defamation in its own right, even if the defendant maliciously publishes the defamatory statements, knowing them to be false, and with intent to injure. It has further been held that no distinction as to the right to maintain such a suit will be made between the proprietary and the governmental functions of the entity."

Open discussion of governmental practices and policies requires that untrammelled criticism of government be protected; if critics of government, be they citizens or press, speak only at the risk of being prosecuted for libel or slander, few will criticize government at all. Even where the critic is certain that his defense of truth would carry the day, the expense and inconvenience of defending the litigation could deter all but the most determined gadfly.[2] As James Madison succinctly explained, "[t]he censorial power is in the people over the Government, and not in the Government over the people." 4 Annals of Cong. 934 (1794). Thus the rule that government cannot be defamed by its citizens "is now an indisputable axiom," Tribe, supra, § 12-12, p. 632.

Although the Authority does not directly dispute this rule, it does dispute its application to this case. In short, the Authority asserts that it is a "quasi-private" hospital and a "quasi-governmental entity", not purely a governmental entity, and that as such it may sue for libel. It argues that its ability to provide health care services to the needy is dependent upon the confidence of its paying patients in its ability to provide quality medical care and that vindication by damages for libel is necessary to maintain the confidence of its clientele.

It is true that the United States Supreme Court has not addressed this precise issue. In the two cases in which that Court found that the government could not maintain an action for libel, the nature of the governmental entities involved was different in several particulars from that of the Authority. In effect, one issue in the New York Times case, supra, was whether a suit for libel by a police department would lie — and the Court ruled that it would not. The plaintiff in the New York Times case was not the police department but the Commissioner of Public Affairs whose duty it was to supervise the police department. The Commissioner, however, was not named in the allegedly defamatory advertisement which referred to police armed with shotguns and tear gas, arrests for petty offenses, and charges of perjury. In determining that the Commissioner could not maintain a personal action for libel, the Court ruled that to allow him to do so given the particular advertisement complained of would be to sidestep the rule prohibiting a governmental entity from suing for libel by transmuting criticism of government into personal criticism. 376 U. S., supra, at 292.

Subsequently, in Rosenblatt v. Baer, supra, the Court reached a

---

[2] Of course an individual, albeit a government official, libeled for action taken in his official capacity may sue for libel. The government, on the other hand, would use its critics' own money (public funds) to silence their criticism.

similar result as to the Belknap County Recreation Area in New Hampshire, saying (383 U. S. at 85): "Criticism of those responsible for governmental operations must be free, lest criticism of government itself be penalized." Belknap was a ski resort operated by the Recreation Area. Baer, the plaintiff in that case, had been employed as manager of the Recreation Area. Rosenblatt, supra, 383 U. S. at 77-78, N. H. Laws 1953, p. 553. The manager was employed by the county commissioners and the Recreation Area itself was not a separate legal entity. N. H. Laws 1953, p. 553; cf. N. H. Laws 1959, p. 553.

Reviewing the few cases on this point in lower federal courts and other jurisdictions, we find none precisely on point. Most involve typical municipal corporations, i.e., cities. City of Philadelphia v. The Washington Post Co., 482 FSupp 897 (E. D. Pa. 1979); Johnson City v. Cowles Communication, Inc., 477 SW2d 750 (Tenn. 1972); Albany v. Meyer 279 P 213 (Cal. App. 1929); City of Chicago v. Tribune Co., supra. The bar of course also applies to states. State v. Time, Inc., 249 S2d 328 (La. App.), writ den. 252 S2d 456 (La. 1971).

A park district with the power to issue bonds was found to be a municipal corporation unable to sue for libel in Progress Development Corp. v. Mitchell, 219 FSupp 156 (D. Ill. 1963). See also Board of Education v. Marting, 217 NE2d 712 (9) (Ohio Ct. Common Pleas 1966) (school district cannot sue taxpayer for malicious prosecution).

A New York court has held that an off-track betting corporation is precluded from bringing an action for defamation. Capital District Regional Off-Track Betting Corp. v. Northeastern Harness Horsemen's Asso., 399 NYS2d 597 (Sup. Ct. 1977). A review of the relevant New York legislation shows that, except as to its purpose, this corporation is quite similar to the Hospital Authority insofar as its relationship to its parent is concerned, L. 1973, Ch. 346 § 5, McKinney's Session Laws, Sections 170-187.[3] There is, of course, the difference that the purpose of the Off-Track Betting Corp. is to raise revenues for the support of government, Id., § 4, Section 116, while the purpose of the Hospital Authority is to provide services to both paying and indigent patients and the Authority is directed not to raise surplus revenues, but rather to fix its rates and charges so as to produce only the revenues necessary to provide the services for which it is established and to meet its obligations. Ga. L. 1964, pp. 598, 602; Code Ann. § 88-1806. Thus, resolution of this critical issue requires a close examination of the nature of the Authority.

---

[3] Regional Off-Track Betting Corporations use public funds, have the power of eminent domain, are deemed "municipalities," and their directors are appointed

The Carroll City/County Hospital Authority was created pursuant to the Hospital Authorities Act, Ga. L. 1941, p. 241 et seq.[4] Its existence is now governed by the Georgia Health Code of 1964, a comprehensive revision of laws relating to public health, Ga. L. 1964, p. 499 et seq., particularly Chapter 88-18, the Hospital Authorities Law, Ga. L. 1964, p. 598 et seq. (Code Ann. Ch. 88-18). That law provides that the Authority is "a public body corporate and politic" with a board to be appointed or nominated "by the governing body of the county or municipal corporation of the area of operation..." Ga. L. 1964, pp. 598, 599; Code Ann. § 88-1803. The Authority is granted "the same exemptions and exclusions from taxes as are now granted to cities and counties for the operation of facilities similar to facilities to be operated by hospital authorities..." Ga. L. 1964, pp. 598, 601; Code Ann. § 88-1803. The members of the board receive no compensation for their services although they may be reimbursed for expenses. Ga. L. 1964, pp. 598, 601; Code Ann. § 88-1804. The Authority is "deemed to exercise public and essential governmental functions" and has "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this Chapter..." Ga. L. 1964, pp. 598, 601; Ga. L. 1978, p. 1970, 1971; Code Ann. § 88-1805. These powers include the power to sue and be sued; to exercise the power of eminent domain; and to receive proceeds from the sale of county bonds and other county obligations. Id.[5] The Authority may not operate for profit; i.e., it must fix its rates and charges so as to produce revenues only sufficient, in combination with its other funds, to provide the services for which it is established and to meet its obligations. Ga. L. 1964, pp. 598, 602; Code Ann. § 88-1806. The Authority is empowered to issue and sell negotiable revenue anticipation certificates, refunding and other certificates, Ga. L. 1964, pp. 598, 602-3; Ga. L. 1980, pp. 1140, 1142; Code Ann. § 88-1807; but these certificates are not a debt of the city, county, state, or any political subdivision thereof, although they are declared to be issued for an essential public and governmental purpose and to be exempt

---

and are deemed "municipal officers" for the purposes of article eighteen of New York's general municipal law which governs "Conflicts of Interest of Municipal Officers and Employees." Id., Section 172 (9).

[4] Tanner Memorial Hospital reportedly was the first hospital in the nation built under the Hill-Burton Act, Pub. L. No. 79-725, 60 Stat. 1041 (1946), a federal-state program which authorizes federal financial assistance for the construction and modernization of hospitals and other medical facilities. Nat. Assn. of Neighborhood Health Ctrs. v. Mathews, 551 F2d 321, 324 (D. C. Cir. 1976).

[5] The Authority's power to sue is not dispositive of the first amendment issues involved here.

from all taxes. Ga. L. 1964, pp. 598, 603; Code Ann. § 88-1808.[6] The Authority does not have the power to tax; however, where a county or city has executed a contract with the Authority for use of the Authority's facilities and services, the county or city may use its general funds to pay for the services and facilities, and the county or city may levy an ad valorem tax and appropriate the revenues realized to the Authority pursuant to the contract. Ga. L. 1964, pp. 598, 606; Ga. L. 1968, pp. 1098, 1099; Code Ann. § 88-1812. Under Ga. L. 1964, pp. 598, 607; Code Ann. § 88-1813, sums due and payable under the contract shall not exceed "the amounts necessary to provide adequate and necessary facilities for medical care and hospitalization of the indigent sick, including reasonable reserves necessary for expansion and necessary for the payment of the cost of facilities of the projects. . ." Finally, upon dissolution of the Authority, disposition of its property "shall be covered in any resolution adopted by the participating units and the board of trustees of the authority. At no time, however, shall any authority upon dissolution convey any of its property except as may be otherwise authorized by law to any private person, individual, association, or corporation." Ga. L. 1964, pp. 598, 609; Code Ann. § 88-1817.

Factors tending to establish the Authority's governmental nature include that it is a creature of statute; that it is defined as a "*public* body corporate and *politic*"(emphasis supplied); that its Board is appointed by the governing body of the relevant political subdivision or subdivisions; that it is tax exempt; that it is deemed to exercise public and essential governmental functions; that it may exercise the power of eminent domain; that is receives tax revenues; and that the governing bodies of the relevant political subdivisions have a role in determining the disposition of its property upon dissolution.

Yet marriage and private corporations are creatures of statutes but no one would call them governmental entities. Tax exemptions may be extended to private corporations, *Great Northern Nekoosa*

---

[6] The exemption from "all taxes" by Georgia's General Assembly does not, of course, encompass federal taxes. Interest earned on obligations of the Authority may, however, be free from federal income tax because the Authority may well qualify as a "political subdivision" under 26 USC § 103 (a) (1). See Commissioner v. Shamberg's Estate, 144 F2d 998 (2d Cir. 1944); cert. denied, 323 U. S. 792 (1945) (involving the Port Authority of New York, the nation's first "authority," 144 F2d at 1003); Commissioner v. White's Estate, 144 F2d 1019 (2d Cir. 1944), cert. denied, 323 U. S. 792 (1945); cf. The Seagrave Corp. ¶ 38.27 P-H TC (1962) (a volunteer fire department held not to be a political subdivision).

*Corp. v. Board of Tax Assessors,* 244 Ga. 624 (2) (261 SE2d 346) (1979), as may the power of eminent domain. Code Ann. § 36-801. The fact that the power of eminent domain may be delegated to a "public" utility shows that a private corporation may exercise public functions. *Harwell v. Georgia Power Co.,* 246 Ga. 203 (269 SE2d 464) (1980). This is not to suggest that the Authority does not have a governmental nature — it indisputably does.[7] Yet the Authority lacks some of the attributes of sovereignty, e.g., the power to tax. Furthermore, this court's holding in *McLucas v. State Bridge Bldg. Auth.,* 210 Ga. 1, 6 (77 SE2d 531) (1953), that a state authority is "not the State, nor a part of the State, nor an agency of the State. It is a mere creature of the State, having distinct corporate entity" applies with full force to this Authority as well, after substituting "city/county" for "state." It is clearly not a municipal corporation as such, or a county, but merely their instrumentality. And it is not their instrumentality in the sense that a department or an agency might be because it is a separate corporate entity. 3 EGL Authority Financing, § 4 (1975).

Yet a substantial body of case law in effect treats hospital authorities as governmental in nature. In *Hospital Auth. of Albany v. Stewart,* 226 Ga. 530 (175 SE2d 857) (1970), it was held that property owned by a hospital authority created under Code Ann. Ch. 88-18 was public property so as to be exempt from ad valorem taxation. Hospital Authorities are also exempt from sales and use taxes. *Undercofler v. Hospital Auth. of Forsyth County,* 221 Ga. 501 (1) (145 SE2d 487) (1965). Hospital authorities are subject to our "open records" law. *Griffin-Spalding County Hospital Auth. v. Radio Station WKEU,* 240 Ga. 444 (241 SE2d 196) (1978); *Atchison v. Hospital Auth. of St. Marys,* 245 Ga. 494 (265 SE2d 801) (1980); see also *Doe v. Sears,* 245 Ga. 83 (263 SE2d 119) (1980), involving the Atlanta Housing Authority. And hospitals operated by authorities are subject to examination by grand juries as facilities of the county. See *Thompson v. Macon-Bibb County Hospital Auth.,* 246 Ga. 777 (1980).

Although we have found no decision precisely on point (i.e., where the plaintiff was an entity identical in structure to this plaintiff), we nevertheless are compelled to conclude that the Authority is merely the way the government has chosen to do its business in this instance. Certainly the government is authorized to

---

[7] For a discussion of the nature of authorities see Bonapfel, "The Legal Nature of Public Purpose Authorities: Governmental, Private, or Neither?" 8 Ga. L. Rev. 680 (1974).

operate hospitals, either directly or, as here, indirectly. Code Ann. § 2-6102 (3). And we find no case authority indicating that the government can sue for libel when injured even in its proprietary capacity. Quite the contrary, in its landmark opinion, the Supreme Court of Illinois wrote: "While for certain limited purposes it is often said that a municipality owns and operates its public utilities in its capacity as a private corporation and not in the exercise of its powers of local sovereignty, yet because of its proprietary rights it does not lose its governmental character . . . It is manifest that, the more so-called private property the people permit their governments to own and operate, the more important is the right to freely criticize the administration of the government. As the amount of property owned by the city and the amount of public business to be transacted by the city increase, so does the opportunity for inefficient and corrupt government increase . . . In so far as the question before us is concerned, no distinction can be made with respect to the proprietary and governmental capacities of a city." City of Chicago v. Tribune Co., supra, 139 NE at 91.[8]

We have reviewed the nature of the Authority and determined that it is a "governmental entity." Ga. L. 1964, p. 598 et seq., Code Ann. § 88-18. We have found that a governmental entity is absolutely barred from prosecuting a cause of action for libel — regardless of whether the libel was against the governmental entity in its governmental or its proprietary function. E.g., Rosenblatt v. Baer, supra. We conclude that although a hospital authority's purpose may be impaired or defeated by unjust criticism and although the two U. S. Supreme Court decisions in this area involved entities that were more clearly part and parcel of a county or a city, their teaching and that of their progeny is that to allow the Authority to pursue this litigation would contravene the first amendment to the Constitution of the United States. Rosenblatt v. Baer, supra; New York Times Co. v. Sullivan, supra. Thus the Newspaper is entitled to have its motion for summary judgment granted. In view of this determination, it is not necessary for us to consider the other issues and contentions raised: "actual malice," privilege of neutral reporting, and privilege of public interest reporting.

We are not unaware that critics of the press may be concerned lest the media abuse its privilege to criticize government. For while

---

[8] We note, however, that despite the U. S. Supreme Court's apparent approval of City of Chicago, supra, the American Law Institute has declined to express an opinion on "whether there may be liability for defamation of a municipal corporation and if so under what circumstances." Restatement, second, Torts § 561, Caveats (2). Messrs. Harper and James, The Law of Torts, Vol. 1, § 5.3, p. 361 (1974), would allow a municipal corporation to recover for defamation of its proprietary functions.

freedom of the press is mandated by our Constitution, a responsible press is not. Miami Herald Publishing Co. v. Tornillo, 418 U. S. 241, 256 (94 SC 2831, 41 LE2d 730) (1974). The answer is two-pronged. Individuals holding governmental office remain free to vindicate their interests in their good reputations by personal actions for libel. The powerlessness of government itself to do so is the price our society has with absolute constancy stood ready to pay to insure that its citizens retain one of their most basic rights and cherished traditions — that of criticizing the government freely and without fear of retaliation. Paraphrasing what Judge Learned Hand wrote in another context, United States v. Associated Press, 52 FSupp 362, 372 (S.D.N.Y. 1943), the First Amendment presupposes that right conclusions are more likely to be gathered out of a multitude of tongues; upon this principle we have staked our all.

*Judgment reversed. All the Justices concur. Gregory, J., not participating.*

DECIDED JANUARY 15, 1981.

*Hansell, Post, Brandon & Dorsey, Albert G. Norman, Jr., Charles T. Zink, John E. Zamer, James H. Bone, Prince & Vassey, Douglas Vassey,* for appellant.

*Tisinger, Tisinger & Vance, David H. Tisinger, Thomas E. Greer,* for appellee.