## A93A1022. BREWER v. ROGERS et al.
### (439 SE2d 77)

BEASLEY, Presiding Judge.

Brewer appeals from the grant of summary judgment to State Superintendent of Schools Rogers, Gillett Communications of Atlanta, Inc. d/b/a WAGA-TV 5, and its news reporter Shuler. Brewer sued these parties, plus the State of Georgia, in a number of counts. Relevant to the appeal are claims of libel and defamacast by WAGA and Shuler, slander by Rogers, and false light invasion of privacy by WAGA and Shuler.[1]

The television newscast at issue was aired on November 14, 1989, and was prompted by a then-current investigation of alleged grade changes for a football-playing student at an Athens high school, which WAGA first learned about from a wire service within the two weeks prior to WAGA's newscast. Brewer was the head football coach, and the team was known to be one of the best in the state. The news report of the investigation was given by Shuler and, through his interview, Rogers. It featured Brewer as one involved in the affair and named no one else. Shuler related that fifteen years earlier, in 1974, Brewer and three major gambling kingpins had been arrested when Brewer was assistant football coach at Cobb County's Wheeler High School, in a $7,000,000 sports gambling ring which police called "one of the biggest operations in the state," netting $20,000 a month on college and professional sports.

Shuler related that Brewer was charged with commercial gambling, keeping a gambling place, and felony possession of a pound of marijuana, pointing out that Brewer's was the only raided location which yielded drugs. He stated that when Brewer was indicted by the grand jury, he pleaded guilty to the drug charge "and, in a first offender plea arrangement, pleaded no contest to the gambling charges." In return, he reported, a judge "sentenced Brewer to one year of probation and a $1,000 fine and sealed the court records."

Shuler then introduced an interview with State School Superintendent Rogers, conducted a few hours earlier, by reporting that Rog-

---

[1] Counts for public disclosure invasion of privacy by WAGA and Shuler and for invasion of privacy by the State acting through Rogers were also included but are not within the scope of Brewer's appeal.

ers said his office was not aware of Brewer's criminal record until it was revealed by Eyewitness News. He asked Rogers how these things slip by, and Rogers said he did not know and wished they had not, and that if they had known of it, "of an individual being found guilty of a felony," they would have reported it to the PPC[2] for investigation. Shuler then reported that Rogers advised that when some school systems discover a problem teacher, they avoid controversy by "passin' the trash" on to another school.

Rogers stated that he thought it unacceptable to have individuals involved in activities "like that," particularly any that involve young people, grade changing, morals charges, or anything like that. The newscast continues with Shuler stating that Rogers said he wanted to know what Brewer stated on his application form on the line that asks, "Have you ever been convicted of a felony?" It ends with Shuler stating that Rogers says he will have the state investigate the principals if he catches school systems failing to report "incidents like this one."

Brewer and his wife at the time were arrested on October 21, 1974, for commercial gambling, keeping a gambling place, and violation of the Georgia Controlled Substances Act. The PPC was advised of this shortly thereafter by letter dated October 29 from Cobb's Assistant Superintendent of Schools, which included attachments documenting this. It also advised that Mr. and Mrs. Brewer resigned on October 22 and their resignations were accepted on October 24. The letter shows that a copy was sent to the then State Superintendent of Schools, Nix. In response, the PPC wrote on November 1 that it took jurisdiction. It advised that it would investigate and possibly revoke teaching certificates but would await court adjudication unless it was prolonged, and that in any event it would keep the Cobb superintendents informed of its activities.

On the same day, which was eleven days after the arrest, Brewer entered pleas of nolo contendere to two misdemeanor counts of commercial gambling and keeping a gambling place and a guilty plea to a felony count of possession of a pound of marijuana. This was on an accusation of the district attorney, Brewer having waived grand jury indictment. He was sentenced to a fine of $250 on each misdemeanor and a fine of $500 on the felony, with one year's probation on the felony and treatment under the First Offender Act for it. (OCGA § 42-8-60 et seq.)

About five months later, on May 29, 1975, the court wrote to the PPC as requested and enclosed a copy of the plea and sentence and

---

[2] State of Georgia Professional Practices Commission, a public agency. OCGA § 20-2-790 et seq.

transcript of the proceedings. The court pointed out in the letter that Brewer received first offender treatment and would not have a record if he complied with the court order. The court further advised that all charges against Mrs. Brewer were dismissed. Brewer did not lose his certification.

The transcript sent to the PPC reveals that during the court proceedings, the district attorney stated that with respect to the large gambling operation reported in the newspaper, "Mr. Brewer's case is separate and independent and has no relationship whatsoever legally or factually to the cases which were made against these other persons. Our investigation reveals that this was a rather small-time, if not penny ante, operation here; that no great amount of bets had been placed, and it was confined to a very small and limited group of individuals, some four or five people, that we have been able to tell." He related that the Illegal Services Division of the police concurred in the recommended disposition, which was subsequently implemented.

In September, upon petition from Brewer and with the consent of the district attorney, the court ordered the clerk to seal the record and the "indictment" so that "the same will not be available to the public; however, the Clerk is required to furnish the indictment (sic) and sentence to any court when ordered to do so." The records in the Identification Bureau were likewise ordered sealed.

Three months later, on December 9, 1975, upon the petition of the probation supervisor, the court ordered Brewer "discharged without court adjudication of guilt . . . [which] shall completely exonerate [Brewer] of any criminal purpose . . . not affect any of [Brewer's] civil rights or liberties, and [Brewer] shall not be considered to have a criminal conviction." This was in exact conformance with the requirements of OCGA § 42-8-62 (a). The court ordered that copies be sent to the State Probation System and the Identification Division of the FBI.

The information about Brewer which was related on the newscast was obtained by Shuler on the day of the newscast from the superior court docket book and two news articles from the Marietta Daily Journal. One, undated in the record, apparently appeared a few days after the arrests on October 21 and was primarily about Brewer, although the arrests of others was also included. He and they were described as "bookmakers." The other is dated November 5, four days after the plea and sentencing, and reports the arrest of the three "kingpins" of the large gambling operation the day before the article. It connected Brewer with the gambling ring and reported on Brewer's pleas and sentences, but it did not mention the first offender treatment.

Shuler testified that the court docket stated that Brewer had been "adjudicated not guilty," and this as well as other portions of

the docket sheet were flashed across the screen.

Brewer testified that he disclosed the arrest and discharge to his subsequent employers in various school systems, including the last one in Athens. The superintendent of the Clarke County schools testified that he disclosed it prior to his employment there.

1. On summary judgment, all evidence and all reasonable inferences which may be drawn therefrom are viewed favorably to the non-movant. *Barber v. Perdue*, 194 Ga. App. 287, 289 (390 SE2d 234) (1989). This includes "questions of credibility and of the weight to be accorded particular evidence." *Masson v. New Yorker Magazine*, 501 U. S. ___ (111 SC 2419, 115 LE2d 447, 475) (1991). Defendants must demonstrate that there is no genuine issue of material fact as to any essential element of plaintiff's case. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991); OCGA § 9-11-56.

2. The count of libel against WAGA and its employee Shuler merges with the count alleging "defamacast" and is constituted of defamation on television. *American Broadcasting &c. v. Simpson*, 106 Ga. App. 230 (1) (126 SE2d 873) (1962); OCGA § 51-5-10 (a). The count alleging slander by Rogers is governed by OCGA § 51-5-4. "Defamation by broadcast includes elements of both libel (OCGA § 51-5-1) and slander (OCGA § 51-5-4)." *S & W Seafoods Co. v. Jacor Broadcasting*, 194 Ga. App. 233, 234 (1) (390 SE2d 228) (1989).

(a) We cannot say as a matter of law that the statements made were true. As appeared in the public record, if not fully on the docket sheet itself, then in the record of the PPC, Brewer had been discharged without court adjudication of guilt. The law states that "[t]he discharge shall completely exonerate the defendant of any criminal purpose and shall not affect any of his civil rights or liberties; and the defendant shall not be considered to have a criminal conviction." OCGA § 42-8-62 (a). As said in *Witcher v. Pender*, 260 Ga. 248, 249 (392 SE2d 6) (1990), "[t]his provides the person who successfully completes his probation under the first offender statute protection against the stigma of a criminal record."

As described above, there was also public record evidence of PPC knowledge and action and of Brewer's non-involvement in the widespread gambling operation.

A defamatory statement "may be made in indirect terms or by insinuation, [and] the publication thereof must be construed as a whole." *Thomason v. Times-Journal*, 190 Ga. App. 601, 602 (1) (379 SE2d 551) (1989). The question is what construction the average viewer would place upon the telecast. See *Macon Tel. Pub. Co. v. Elliott*, 165 Ga. App. 719, 721 (1) (302 SE2d 692) (1983). "Except where an alleged [publication] is not defamatory as a matter of law, the general rule is that the issue of defamation is a matter of fact to be determined by a jury. [Cit.]" Id. at 720.

As in *Pacific & Southern Co. v. Montgomery*, 233 Ga. 175, 177, 180 (210 SE2d 714) (1974), "[t]he telecast, the pictures and spoken narrative taken in their entire context, together with the testimony of the plaintiff and the defendant news reporter [and interviewee Rogers, and other evidence in the record], convince us that the issue of defamation or no defamation [is] a question of fact for determination by the jury . . . In short, whether this telecast was defamatory of the plaintiff on its face, and whether it was true or not pursuant to [the evidence], [are] issues for determination by the jury."

The concept of falsity vel non was aired by the United States Supreme Court in *Masson*, supra. Defamation law "overlooks minor inaccuracies and concentrates upon substantial truth. . . . a statement is not considered false unless it 'would have a different effect on the mind of the [viewer] from that which the pleaded truth would have produced.'" *Masson*, supra at 472. The Court concluded that it was a jury question in that case.

(b) If there is falsity, the question arises whether Brewer is a public figure. A mixed question of law and fact, it is one for the court and not the jury to determine. *Sewell v. Eubanks*, 181 Ga. App. 545, 546 (1) (352 SE2d 802) (1987); *Williams v. Trust Co. of Ga.*, 140 Ga. App. 49, 53 (230 SE2d 45) (1976). It is decided on a case-by-case basis. See *Ellerbee v. Mills*, 262 Ga. 516, 520 (2) (422 SE2d 539) (1992) (special concurrence); see also *Byers v. Southeastern Newspapers Corp.*, 161 Ga. App. 717, 719 (288 SE2d 698) (1982). Compare *Gertz v. Robert Welch, Inc.*, 418 U. S. 323 (94 SC 2997, 41 LE2d 789) (1974), which set out that an individual becomes a public figure on one of two alternative bases: "In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues. In either case such persons assume special prominence in the resolution of public questions." Id. at 351.

Based on the record, we conclude that the trial court did not err in finding Brewer to be a public figure, for the purposes of this suit.

(c) Because Brewer was a public figure, both at the time of the 1974 episode and also at the time of the 1989 broadcast, actual malice of the truth must be proved. *New York Times Co. v. Sullivan*, 376 U. S. 254 (84 SC 710, 11 LE2d 686) (1964). "A public figure may not recover damages for a defamatory falsehood without clear and convincing proof that the false 'statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.'" *Harte-Hanks Communications v. Connaughton*, 491 U. S. 657, 659 (109 SC 2678, 105 LE2d 562) (1989). See *Williamson v. Lucas*, 166 Ga. App. 403, 404 (2) (304 SE2d

412) (1983); *Eidson v. Berry*, 202 Ga. App. 587, 588 (415 SE2d 16) (1992). A better term than "actual malice," wrote the United States Supreme Court in *Masson*, supra at 469, is that the publication must be "with knowledge of falsity or reckless disregard as to truth or falsity." On summary judgment in such cases, the question is "whether a genuine issue of actual malice exists — that is, whether the evidence presented is such that a reasonable jury might find that actual malice had been shown with convincing clarity." *Anderson v. Liberty Lobby*, 477 U. S. 242, 257 (106 SC 2505, 91 LE2d 202) (1986).

For First Amendment purposes, "reckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." *St. Amant v. Thompson*, 390 U. S. 727, 731 (88 SC 1323, 20 LE2d 262) (1968). The Court considered the competing interests and applied the following rationale: "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that the First Amendment protect some erroneous publications as well as true ones." Id. at 732.

Assuming the broadcast communicated falsities or a falsity by Shuler or Rogers or both, there is no evidence which would indicate an awareness by either of them of the probable falsity. Compare *Barber*, supra at 290-291. Brewer's complaint is that they failed to investigate adequately. However, "[f]ailure to investigate does not in itself establish bad faith." *St. Amant*, supra at 733, citing *New York Times Co. v. Sullivan*, supra at 287-288. There is no evidence which would establish the required degree of reckless disregard with respect to Rogers, other than his apparent failure to investigate at all before he spoke in the televised interview. Shuler's failure to go beyond the court docket sheet or the two 1974 newspaper articles to ascertain the meaning and ramifications of first offender and "adjudicated not guilty," or the actions of the PPC, or the accuracy of the newspaper-alleged tie to a huge gambling operation, or whether Brewer had disclosed the matter to school employers, does not evince actionable reckless disregard. "[T]he defendant must have made the false publication with a 'high degree of awareness of . . . probable falsity,' *Garrison v. Louisiana*, 379 U. S. 64, 74 [(1) (85 SC 209, 13 LE2d 125)] (1964), or must have 'entertained serious doubts as to the truth of his publication,' *St. Amant,* supra, at 731." *Harte-Hanks Communications*, supra at 667. What defendants did or did not do here differs from the circumstances in *Curtis Publishing Co. v. Butts*, 388 U. S.

130 (87 SC 1975, 18 LE2d 1094) (1967), where the investigatory techniques employed evidenced "an intent to avoid the truth." *Harte-Hanks Communications*, supra at 692-693.

As to the use of the first offender treatment information when there has been a complete discharge, the cases construe the intent of the Act to allow only limited use. In *State of Ga. v. C. S. B.*, 250 Ga. 261 (297 SE2d 260) (1982), for example, the court points out the need for use in a subsequent prosecution of the same defendant. See OCGA § 42-8-65. The Court also noted the increased confidentiality of first offender records added by the legislature in 1978: access to records of discharge restricted to specified prosecutorial and probation officials upon certification of pending criminal charges (OCGA § 42-8-65); and discharge not useable to disqualify one for employment (OCGA § 42-8-63). However, the Court held, the Act does not intend complete expungement of the record.

Evidence of the guilty plea underlying the discharged first offender's treatment may not be used to impeach him by showing he has been convicted of a crime involving moral turpitude, *Witcher*, supra, but may be used in a civil trial to impeach an adverse witness by disproving or contradicting his testimony. *Hightower v. General Motors Corp.*, 255 Ga. 349 (338 SE2d 426) (1986). Since possible lack of trustworthiness is shown by a plea of guilty, even without a formal conviction, the Supreme Court held in *Favors v. State*, 234 Ga. 80, 87 (3) (214 SE2d 645) (1975), that a defendant in a criminal case could use the first offender guilty plea to impeach the testimony of the witnesses against him. In reaching this ruling, the Court balanced this right against the rights of the first offender to protection against the stigma of a criminal record. A prior first offender guilty plea which culminates in a discharge cannot be used later to sentence a defendant as a recidivist. *Queen v. State*, 182 Ga. App. 794 (1) (357 SE2d 150) (1987). First offender disposition and discharge does not preclude, under OCGA § 42-8-62 (a), "the admission of evidence of the underlying conduct itself for the purpose of showing a similar transaction engaged in by the same person" in a subsequent criminal case. *Tilley v. State*, 197 Ga. App. 97, 99 (2) (397 SE2d 506) (1990).

Whether defendants were authorized to use the first offender information in the first place for this public broadcast is not an issue pursued by Brewer, and thus we do not decide it. The only claims on appeal are defamation and false light invasion of privacy. We note in *Cox Broadcasting Corp. v. Cohn*, 420 U. S. 469, 492 (95 SC 1029, 43 LE2d 328) (1975), the Supreme Court's view that "[w]ith respect to judicial proceedings in particular, the function of the press serves to guarantee the fairness of trials and to bring to bear the beneficial effects of public scrutiny upon the administration of justice."

3. Brewer's claims for false light invasion of privacy by Shuler

and WAGA likewise do not survive summary judgment, based on the evidence of record.

"Invasion of privacy was first recognized in this state in the landmark case of *Pavesich v. New England Life Insurance Co.*, 122 Ga. 190 (50 SE 68) (1904): The right of privacy is embraced within the absolute rights of personal security and personal liberty. Personal security includes the right to exist and the right to the enjoyment of life while existing, . . . Personal liberty includes not only freedom from physical restraint, but also the right 'to be let alone,' . . ." *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 704 (1) (409 SE2d 835) (1991).

*Cabaniss v. Hipsley*, 114 Ga. App. 367, 370 (151 SE2d 496) (1966), divides the tort of invasion of privacy into four types, only one of which is relevant here: "publicity which places the plaintiff in a false light in the public eye."

In a false light case, " '[t]he interest protected is clearly that of reputation, with the same overtones of mental distress as in defamation.' " Id. at 375 (3). The essential element is that " 'the false light in which the other was placed would be highly offensive to a reasonable person.' " *Thomason v. Times-Journal*, 190 Ga. App. 601, 604 (4) (379 SE2d 551) (1989).

We agree with the trial court that the absence of actual malice in the constitutionally-mandated sense precludes recovery under *Cabaniss*, supra. It was held in *Time, Inc. v. Hill*, 385 U. S. 374 (87 SC 534, 17 LE2d 456) (1967), "that the constitutional protections for speech and press preclude the application of [state law allowing a privacy action] to redress false reports of matters of public interest in the absence of proof that the defendant published the report with knowledge of its falsity or in reckless disregard of the truth." Id. at 387-388. See also *Rosenbloom v. Metromedia*, 403 U. S. 29, 31, n. 1 (91 SC 1811, 29 LE2d 296) (1971).

*Judgment affirmed. Cooper and Smith, JJ., concur.*

DECIDED DECEMBER 2, 1993 —
RECONSIDERATION DENIED DECEMBER 13, 1993 —

*Deedra M. Brewer*, for appellant.

*Michael J. Bowers*, Attorney General, *Kathryn L. Allen, Dennis R. Dunn*, Senior Assistant Attorneys General, *Alston & Bird, Daniel A. Kent, Judson Graves, Richard R. Hays*, for appellees.