A03A2480, A03A2481. ATLANTA HUMANE SOCIETY et al.
v. MILLS; and vice versa.
(618 SE2d 18)

SMITH, Presiding Judge.

This is the second appearance of this appeal before this court. The Atlanta Humane Society (AHS) and its director, Bill Garrett, sued Kathi Mills for allegedly defamatory statements made on an internet bulletin board. In *Atlanta Humane Society v. Mills*, 264 Ga. App. 597 (591 SE2d 423) (2003), we relied on our recent decision in *Harkins v. Atlanta Humane Society*, 264 Ga. App. 356 (590 SE2d 737) (2003), to reverse the trial court's judgment on the basis of the anti-SLAPP (Strategic Lawsuits Against Public Participation) statute, OCGA § 9-11-11.1 (b). The Georgia Supreme Court granted certiorari and consolidated both cases for appeal.

In *Atlanta Humane Society v. Harkins*, 278 Ga. 451 (603 SE2d 289) (2004), the Supreme Court affirmed in part and reversed and remanded in part with direction. With respect to the anti-SLAPP issue, the court agreed with us that the trial court could dismiss a claim on a determination that the claim was falsely verified under OCGA § 9-11-11.1 (b), but found that evidentiary issues remained for resolution and remanded on that basis. Id. at 456. The Supreme Court also noted that with respect to Mills, "the remaining enumerations of error regarding the trial court's summary judgment rulings may render the anti-SLAPP issue moot." Id.

Adopting the approach suggested by the Supreme Court, we affirm the judgment of the trial court in Case No. A03A2480 insofar as it granted summary judgment in favor of Mills on AHS's claims and

---

[27] Id.
[28] Id.

declared Garrett a limited-purpose public figure, but we reverse the trial court's determination that disputed issues of fact remained with regard to the alleged defamation of Garrett. We do not reach the anti-SLAPP issue, and we therefore dismiss Mills's appeal in Case No. A03A2481 as moot.[1]

The underlying facts are not in dispute. In November 2001, WSB Television aired a "Whistle Blower 2" series investigating AHS. The series severely criticized AHS's management of Fulton County animal control, particularly its euthanasia policies, its failure to place animals for adoption, and its failure to assist in investigating animal cruelty cases. Garrett was interviewed as part of the series.[2]

Mills operated an internet animal rescue website known as Kitty Village. After the television series aired, Mills participated in an internet message board discussion of the programs. During that discussion, she made inflammatory statements about AHS and Garrett, including referring to Garrett as "Mr. Kill," stating that he "was not worthy to lick the dog or cat poop off our shoes" and that he was "evil." She relied upon the program's accusations to speculate that AHS policy with regard to euthanasia, adoption, and cruelty investigations was calculated to "maximize profits," and stated that she was withdrawing support for another humane organization led by Garrett "until they get a leader who does not delight in slaughtering pets for fun and profit."

AHS and Garrett filed this action, and Mills answered. Mills moved for summary judgment and also filed a motion to dismiss the complaint as an improperly verified SLAPP under OCGA § 9-11-11.1. AHS and Garrett moved for partial summary judgment on the issue of liability. The trial court entered a lengthy and detailed order analyzing the parties' contentions and granting partial summary judgment in favor of Mills. While declining to dismiss the action as a SLAPP, the trial court held that AHS as a quasi-governmental entity was barred from bringing a defamation action. The trial court also

---

[1] In the companion case, *Harkins v. Atlanta Humane Society*, 273 Ga. App. 489 (618 SE2d 16) (2005), we held that the statements made by Harkins with respect to the same controversy were related to the policies and procedures of AHS, involved issues of public concern, were made in good faith, and as such were privileged as a matter of law under the anti-SLAPP statute. While we do not reach that issue here, we note that virtually the same analysis of the facts is required for the questions raised in this opinion.

[2] AHS and Garrett moved to exclude a videotape of the television broadcasts from the record on appeal, contending that it was never admitted into evidence. But all parties acknowledge that the broadcasts took place, that they were critical of AHS, and that Garrett gave an interview in connection with the broadcasts. Moreover, we need not consider the videotape because the content of the broadcasts is sufficiently described for the purposes of this opinion in the record herein and the published opinion in *Harkins*, supra.

ruled that Garrett is a limited-purpose public figure who must prove both actual malice and compliance with the retraction statute, OCGA § 51-5-11 (a), in order to recover in a defamation action but found that genuine issues of material fact remained with respect to Garrett's claim against Mills. All parties appealed from the trial court's order.

1. We first consider AHS's appeal of the trial court's determination that as a governmental entity it cannot maintain a suit for defamation. The record shows that for approximately 20 years, Fulton County has delegated most if not all of its statutory duties with regard to animal control to AHS. Pursuant to the contract between AHS and the county, which was to remain in effect from year to year unless cancelled by either party, AHS took over the county animal control facility and was delegated to act as the agent of the Fulton County Board of Health and Health Department with respect to public health regulations. These duties included rabies control and the capture and impoundment of animals, issuing dog licenses and collecting license and impoundment fees, and enforcing leash laws, with AHS employees appointed as deputies authorized to issue citations and make arrests.[3] In return, AHS received payments from the county to make up the difference between its expenditures and the income AHS received from fee collections. AHS agreed to indemnify and hold the county harmless.

In *Cox Enterprises v. Carroll City/County Hosp. Auth.*, 247 Ga. 39 (273 SE2d 841) (1981), the Georgia Supreme Court considered the circumstances under which an entity may be considered a "governmental entity" and thus prohibited from suing for defamation:

> We start from the seldom used but well founded rule: Governments and governmental entities cannot maintain an action for libel. Criticism of government is at the very center of the constitutionally protected area of free discussion. No case has been found allowing a government to recover for libel. For good reason, no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of jurisprudence.

(Citations, punctuation and footnote omitted.) Id. at 40. Both parties agree that this decision controls, but they interpret it differently.

---

[3] While the parties dispute the extent to which AHS was responsible for animal cruelty investigations, it appears from Garrett's affidavit that AHS acting as "animal control" did handle misdemeanor cruelty cases under statutory authority.

In determining whether the Carroll City/County Hospital Authority was a governmental entity, the Supreme Court considered

> [f]actors tending to establish the Authority's governmental nature . . . [these] include that it is a creature of statute; that it is defined as a *"public* body corporate and *politic"*. . . ; that its Board is appointed by the governing body of the relevant political subdivision or subdivisions; that it is tax exempt; that it is deemed to exercise public and essential governmental functions; that it may exercise the power of eminent domain; that [it] receives tax revenues; and that the governing bodies of the relevant political subdivisions have a role in determining the disposition of its property upon dissolution.

(Emphasis in original.) *Cox Enterprises*, supra at 44. AHS argues that this is a list of *requirements* to identify all governmental entities, and that failure to meet them demands a finding that it is not a governmental entity for purposes of the rule against defamation actions. We disagree. The language cited by AHS is the Supreme Court's examination of the specific facts applicable to the Carroll City/County Hospital Authority and "tending to establish the Authority's governmental nature." Id. It is not an ironclad list of requirements for each and every case of government delegation of its functions to a private body. In fact, in *Cox* the hospital authority in question did not fulfill all of the items listed by the Supreme Court, but the court nevertheless determined that it was a governmental entity because it was "merely the way the government has chosen to do its business in this instance." Id. at 45.

In this case, the contract between AHS and the county states in the clearest possible language that AHS will take over virtually all the county's statutory duties with regard to animal control, including deputized law enforcement functions, and will be paid from public funds for so doing. Moreover, in connection with WSB Television's investigation for its series, the Attorney General determined that AHS was subject to the Open Records Act and directed that it produce its records regarding "the public services or functions it performs on behalf of Fulton County." Whether an entity was subject to open records requirements is another factor in *Cox* tending to establish its governmental nature. Id. at 45.

As the trial court so aptly observed, the AHS

> receives in excess of $2,000,000.00 annually in public funds from Fulton County to carry out the County's animal control functions. . . . Indeed, as the contract between Atlanta Humane Society and Fulton County so clearly and plainly

sets forth, Fulton County has even deputized employees of Atlanta Humane Society to assist in carrying out these laws and enforcing governmental regulations. If plaintiff Atlanta Humane Society were not subject to the same types of criticism that governmental entities would be subject to in the performance of these functions, it would frustrate the ability of the general public to complain and otherwise effectuate necessary and desirable change when those services fall below standards which the public demands.

(Footnotes omitted.) We agree with the trial court and affirm the grant of summary judgment against AHS with respect to its claims against Mills.

2. Garrett contends the trial court erred in determining that he is a limited-purpose public figure. We disagree.

In *Mathis v. Cannon*, 276 Ga. 16 (573 SE2d 376) (2002), the Georgia Supreme Court adopted the Eleventh Circuit's three-prong test in *Silvester v. American Broadcasting Cos.*, 839 F2d 1491, 1494 (11th Cir. 1988), to determine whether a person is a limited-purpose public figure. "Under this analysis, a court must isolate the public controversy, examine the plaintiff's involvement in the controversy, and determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." (Citation, punctuation and footnote omitted.) *Mathis*, supra at 23. "Whether a person is a public figure, general or limited, is a question of law for the court to resolve." (Citation and footnote omitted.) *Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 816-817 (555 SE2d 175) (2001); see also *Mathis*, supra at 22.

(a) The AHS's performance of Fulton County's animal control duties is the "public controversy" at issue here. This controversy had been publicized by the WSB Television series before Mills made her comments. The AHS's performance was "already the subject of debate in the public arena" (citation and footnote omitted), *Jewell*, supra at 817 (3) (a), and "resolution of the controversy will affect people who do not directly participate in it." *Silvester*, supra at 1494-1495.

(b) The record demonstrates that Garrett involved himself in this controversy. "A plaintiff in a libel case must be deemed a public figure if he purposefully tries to influence the outcome of a public controversy or, because of his position in the controversy, could realistically be expected to have an impact on its resolution." (Citation and footnote omitted.) *Jewell*, supra at 817 (b). *Mathis*, supra, involves quite similar facts. Allegedly defamatory internet bulletin board messages criticized the owner of a private waste hauling business that had contracted with a county waste management authority. The Supreme Court concluded that the owner was a limited-purpose

public figure with regard to the controversy surrounding the effectiveness and profitability of the county waste management operation because he had facilitated the business of the waste management authority, even though he had not given any public statements or news interviews. Of course, it is well established that even a single interview given to the media may be sufficient to establish a plaintiff as a limited-purpose public figure. *Finkelstein v. Albany Herald Publishing Co.*, 195 Ga. App. 95, 97 (1) (392 SE2d 559) (1990); *Sparks v. Peaster*, 260 Ga. App. 232, 236 (1) (581 SE2d 579) (2003).

·The record reflects that Garrett has issued many press releases and given numerous interviews on behalf of AHS, in effect acting as its spokesman on many occasions. In addition, he specifically injected himself into the public controversy that forms the basis of this lawsuit by giving an interview to WSB Television in connection with the investigative series and thus voluntarily participating in the debate on the operation of AHS. He also participated in the debate before the Fulton County Commission by directing a letter in support of AHS to the commissioners.

Our analysis in *Jewell*, supra at 817, also suggests that, as the director of AHS, Garrett may be a limited-purpose public figure who simply "because of his position in the controversy, could realistically be expected to have an impact on its resolution." Id. Moreover, *Jewell* acknowledges the possibility of an *involuntary* public figure: "occasionally, someone is caught up in the controversy involuntarily and, against his will, assumes a prominent position in its outcome. Unless he rejects any role in the debate, he too has 'invited comment' relating to the issue at hand." (Citations, punctuation and footnote omitted.) Id. at 820 (4).

(c) Finally, "a publication is germane to a plaintiff's participation in a controversy if it might help the public decide how much credence should be given to the plaintiff." (Citation and footnote omitted.) *Jewell*, supra at 820 (3) (c). As the director and spokesman for AHS who appeared in the WSB Television series, Garrett was a central figure in this controversy. As in *Mathis*, supra at 22 (3), Mills's internet postings, although "late night rhetorical outbursts of an angry and frustrated person opposed to the" policies of AHS, id. at 25, were "germane to [Garrett's] participation in the controversy." Id. at 24.

In sum, Garrett is the director of and spokesman for AHS, an organization at the center of a controversy over its performance of the duties delegated to it by Fulton County. He voluntarily injected himself into the controversy by participating in the WSB Television investigation of AHS and in the consideration of AHS's performance by the Fulton County Commission. He therefore has become a limited-purpose public figure with respect to this controversy.

3. Though the trial court correctly sifted through the difficult and contentious legal issues of the bar to governmental defamation suits and the status of Garrett as a public figure, it denied summary judgment on the issue of defamation in a single sentence, declaring simply that "there are genuine issues of material fact which remain for trial on Plaintiff Garrett's claims." But in order to prevail, Garrett must demonstrate that Mills acted with actual malice and thus remains potentially liable for defamation.

The standard of proof of "actual malice" with regard to a public figure is extremely high; Garrett must "show by clear and convincing evidence that false and defamatory statements were published with actual malice." (Citation and footnote omitted.) *Jewell*, supra at 823. "Actual malice" in a constitutional sense is not merely spite or ill will, or even outright hatred; it must constitute actual knowledge that a statement is false or a reckless disregard as to its truth or falsity. *Williams v. Trust Co.*, 140 Ga. App. 49, 56 (III) (230 SE2d 45) (1976).

> Actual or constitutional malice is different from common law malice because knowledge of falsity or reckless disregard of the truth may not be presumed nor derived solely from the language of the publication itself. Reckless disregard requires clear and convincing proof that a defendant was aware of the likelihood he was circulating false information. Thus, it is not sufficient to measure reckless disregard by what a reasonably prudent man would have done under similar circumstances nor whether a reasonably prudent man would have conducted further investigation. The evidence must show in a clear and convincing manner that a defendant in fact entertained serious doubts as to the truth of his statements.

(Citations and punctuation omitted.) *Davis v. Shavers*, 225 Ga. App. 497, 500-501 (3) (484 SE2d 243) (1997), aff'd, 269 Ga. 75 (495 SE2d 23) (1998). To that extent, Mills's hyperbolic statements regarding Garrett do not show the constitutional "malice" required for this test.

In *Williams v. Trust Co.*, supra, this court considered the question of actual malice with respect to a public figure and determined from an examination of the record that summary judgment in favor of the defendant was appropriate. The conclusion that malice was not proved rested largely upon various reports about the plaintiff in the Atlanta newspapers, reports that the defendant testified he read, heard about, and believed. Id. at 60-62.

Here, the "Whistle Blower 2" series viewed by Mills made serious allegations against AHS, amounting to a "hatchet job" in the opinion of its counsel. Garrett appeared in the series as the spokesman for

and defender of AHS. Mills's statements were made in response to the television broadcasts. Most were simply Mills's expression of her opinion of Garrett and the organization he leads, although in hyperbolic and sometimes scatological language.

"An assertion that cannot be proved false cannot be held libelous. A writer cannot be sued for simply expressing his opinion of another person, however unreasonable the opinion or vituperous the expressing of it may be." (Citations, punctuation and footnote omitted.) *Gast v. Brittain*, 277 Ga. 340, 341 (589 SE2d 63) (2003). This is particularly true of such obviously exaggerated and unprovable assertions as whether Garrett is "evil" or "worthy" to lick excrement from shoes. Referring to Garrett as "Mr. Kill" is likewise incapable of being proved false, because the AHS under his leadership indeed killed a significant number of animals yearly; in Mills's opinion and that of her amicus curiae, that number is too large and could be reduced by improving adoption procedures. In fact, amicus curiae asserts that when a new animal welfare group took over the Fulton County shelter operations from AHS, the number of adoptions "began to rise dramatically." As the trial court put it, "What is the innuendo? The innuendo is, is that they enjoy killing animals, which you and I cannot disprove, one way or the other. We can't. That's a subjective issue."

Mills's speculation that a profit motive existed for the AHS euthanasia policies might be capable of disproof. But in this case it does not demonstrate constitutional malice, because a financial motive for AHS's alleged misconduct was introduced in the WSB Television series. During an interview, a former employee of AHS stated, "Prior to leaving AHS, I asked 'Why do we not investigate cruelty?' and Bill Garrett said 'We don't — we lose money on every cruelty investigation.'" (Punctuation omitted.) *Harkins*, supra at 357. In addition, as the trial court observed, "The argument can certainly be made by the defendant in this case that when they kill the animals as opposed to keeping them in shelter, that it increases their cash flow in the sense that that money is not outgoing for the expense of the animals."

Garrett asserts that Mills failed to investigate the truth of her statements. But "failure to investigate does not in itself establish bad faith." (Citations and punctuation omitted.) *Williams v. Trust Co.*, supra at 55. Moreover, we have already considered a case in which an individual relied upon the statements of a news reporter in making statements alleged to be defamatory. In *Brewer v. Rogers*, 211 Ga. App. 343 (439 SE2d 77) (1993), a television news report asserted that the plaintiff, a high school coach, had been charged with numerous criminal offenses and pleaded guilty to several in connection with a major gambling ring. Id. This account was substantially inaccurate, but the reporter confronted the state superintendent of schools with

his version of events, and elicited comments that the plaintiff contended were defamatory. Id. at 344.

After determining the plaintiff was a public figure, this court found no evidence of actual malice or awareness of probable falsity. We noted that mere failure to investigate "does not evince actionable reckless disregard. The defendant must have made the false publication with a 'high degree of awareness of probable falsity,' or must have entertained serious doubts as to the truth of his publication." (Citations and punctuation omitted.) *Brewer*, supra at 348. More importantly, we rejected out of hand the allegation of awareness of falsity on the part of the school superintendent who relied upon and responded to the reporter's statements: "There is no evidence [that] would establish the required degree of reckless disregard with respect to [the superintendent], other than his apparent failure to investigate at all before he spoke in the televised interview." Id. at 348.

Even the obligation of a professional news reporter to investigate is limited with respect to a showing of constitutional malice; as *Brewer* notes, this duty to investigate is even less stringent with respect to one who simply responds to or comments upon a reporter's statements. Id. Mills viewed and commented on an investigative television series that AHS's attorney himself described as "a hatchet job." The Fulton County Commission was sufficiently concerned by the series to begin an investigation of AHS shortly after the last television report, *Harkins*, supra at 356, and other citizens appeared and spoke regarding the controversy at the public comment sessions before the commission.

While "sensationalist 'news' reporting" may in some instances be actionable, *Lawton v. Ga. Television Co.*, 216 Ga. App. 768, 772 (456 SE2d 274) (1995), this is not a suit against WSB Television.[4] Private citizens are not required to investigate the investigators to ensure that programs aired by a major television station are accurate and correct before making comments based on those programs, and failure to do so does not amount to malice in a constitutional sense. In other words, if it is not permissible to slay the messenger, it is certainly not appropriate to slay one who simply received and reacted to the intended message. "Neither lies nor false communications serve the ends of the First Amendment, and no one suggests their desirability or further proliferation. But to insure the ascertainment and publication of the truth about public affairs, it is essential that

---

[4] The record does not reflect that AHS or Garrett ever brought suit against WSB Television or its reporters for the accusations made in the series.

the First Amendment protect some erroneous publications as well as true ones." (Citation and punctuation omitted.) *Brewer*, supra at 348.

As a limited-purpose public figure, Garrett has failed to demonstrate actual malice on the part of Mills. We therefore reverse the judgment of the trial court to the extent it denied summary judgment in favor of Mills. Because we do not reach the SLAPP issue, Mills's appeal is dismissed as moot.

*Judgment affirmed in part and reversed in part in Case No. A03A2480. Appeal dismissed in Case No. A03A2481. Ruffin, C. J., and Miller, J., concur.*

ON MOTION FOR RECONSIDERATION.

In Case No. A03A2481, appellant Kathi Mills has moved for reconsideration of the dismissal of her appeal as moot. She argues that a determination of mootness forecloses her right to seek attorney fees under the SLAPP statute. That is not so, however, because that issue has not been ruled on by the trial court or by this court.

The Georgia Supreme Court has already held that this is a case in which a determination may be made that a complaint was falsely verified in violation of the SLAPP statute. *Atlanta Humane Society v. Harkins*, 278 Ga. 451, 456 (2) (603 SE2d 289) (2004). While we declined to reach that issue, we pointed out that for a determination of whether the SLAPP statute was violated, "virtually the same analysis of the facts is required." See p. 160, n. 1. The dismissal of the *appeal* as moot does not change the facts of the *case*.

OCGA § 9-11-11.1 clearly provides: "If a claim is verified in violation of this Code section, the court, upon motion or upon its own initiative, shall impose upon the persons who signed the verification, a represented party, or both an appropriate sanction." OCGA § 9-11-11.1 (b). This sanction may, but need not, include dismissal of the claim as well as the award of reasonable expenses, including attorney fees. Id. Moreover, a motion for such attorney fees and expenses may be requested by motion "not later than 45 days after the final disposition, including but not limited to dismissal by the plaintiff, of the action." OCGA § 9-11-11.1 (f). The dismissal of Mills's appeal for mootness does not foreclose her right to seek this relief in the trial court.

*Motion for reconsideration denied.*

DECIDED JUNE 3, 2005 —
RECONSIDERATION DENIED JULY 6, 2005 —

*Lipshutz, Greenblatt & King, Edward L. Greenblatt, James V. Zito, Janet L. Bozeman*, for appellants.

*Begner & Begner, Alan I. Begner, Robert M. Adelson, Katherine K. Wood,* for appellee.
*James Stark, Stacy S. Levy,* amici curiae.