YABLON *v.* METROPOLITAN LIFE INSURANCE
COMPANY; and *vice versa.*

694

Nos. 15440, 15441.　May 10, 1946.

*Maurice Steinberg* and *Curry & Curry,* for plaintiff.
*Cohen & Cohen,* for defendant.

CANDLER, Justice. (After stating the foregoing facts.) █ It is error to direct a verdict, except where there is no conflict in the evidence as to the material facts, and the evidence introduced, together with all reasonable deductions and inferences therefrom, demands a particular verdict. Code, § 110-104; *Hughes* v. *Cobb,* 195 *Ga.* 213 (23 S. E. 2d, 701) ; *Shaw* v. *Probasco,* 139 *Ga.* 481 (77 S. E. 577). In *Dixon* v. *Bristol Savings Bank,* 102 *Ga.* 461, 468 (31 S. E. 96), this court said: "Where reasonable men might differ as to the inferences to be drawn from certain evidence, the matter should be left to the jury although there may be no conflict in the evidence." And in *Taylor* v. *Chattooga County,* 180 *Ga.* 90 (178 S. E. 298), it was held: "No principle is more firmly established in American jurisprudence than that the court can not direct a verdict where there is any reasonable inference supported by evidence which would authorize a verdict to the contrary." This rule was stated in *Snowball* v. *Seaboard Air-Line Railway,* 130 *Ga.* 83 (60 S. E. 189) : "Where the question is one of diligence or negligence, and a particular conclusion is sought to be established from a given state of facts, the jury are the alchemists to make the test, and announce the result."

However, since the plaintiff also made a motion for a directed verdict, it is contended that he can not now be heard to complain that one was directed for the defendant, and in support of the contention, these cases are cited: *Groover* v. *Savannah Bank & Trust*

*Co.,* 60 *Ga. App.* 357 (3 S. E. 2d, 745); *Mims* v. *Johnson,* 8 *Ga. App.* 850 (70 S. E. 139); *Sovereign Camp W. O. W.* v. *Beard,* 26 *Ga. App.* 130 (105 S. E. 629). We can not agree with this contention and neither do we think that the authorities cited sustain it. In those cases it appears that the parties consented for the verdict to be directed for one or the other, waiving the right to have the jury pass on the issues involved. No such consent appears in this case, and under these circumstances the plaintiff in error did not waive the right to have the issues submitted to the jury, or the right to except on grounds asserting that it was erroneous to direct a verdict for the defendant or that the verdict so directed was erroneous. *Roberts* v. *Wilson,* 198 *Ga.* 428 (31 S. E. 2d, 707); *Elder* v. *Woodruff Hardware &c. Co.,* 16 *Ga. App.* 255 (85 S. E. 268); *Gross* v. *Butler,* 48 *Ga. App.* 750 (173 S. E. 866). See *Broadhurst* v. *Hill,* 137 *Ga.* 833, 841 (7) (73 S. E. 422); *Riley* v. *London Guaranty &c. Co.,* 27 *Ga. App.* 686 (2) (109 S. E. 676). If the rules of practice and procedure were otherwise, a party would always jeopardize his rights by making a motion that a verdict be directed in his favor.

■ A mistake, either of law or fact, is cognizable in equity and affords a remedy therein by reformation of the instrument so as to make it express the true intention of the parties, on a proper cause being made; but such a jurisdiction will always be cautiously exercised, and to justify it the evidence must be clear, unequivocal, and decisive. Code, § 37-203; *Wyche* v. *Greene,* 11 *Ga.* 159; *Ligon's Administrators* v. *Rogers,* 12 *Ga.* 281; *Wyche* v. *Greene,* 16 *Ga.* 49; *Green* v. *Johnson,* 153 *Ga.* 738 (113 S. E. 402); *Deck* v. *Shields,* 195 *Ga.* 697 (25 S. E. 2d, 514). "Mistake relievable in equity is some unintentional act, or omission, or error, arising from ignorance, surprise, imposition, or misplaced confidence." Code, § 37-202. Section 37-206, declares: "In all cases of a mistake of fact material to the contract or other matter affected by it, if the party complaining applies within a reasonable time, equity will relieve." But equity will not decree the reformation of an instrument because of mistake of one of the parties alone unmixed with any fraud or knowledge on the part of the other equivalent to mutual mistake. For a mistake to be relievable in equity by reformation, it must be mutual, or else mistake on the part of one to the contract and fraud on the part of the other. *Quiggle* v.

*Vining,* 125 *Ga.* 98 (54 S. E. 74); *Salvage Sales Co.* v. *Aarons,* 181 *Ga.* 133 (181 S. E. 584); *Helton* v. *Shellnut,* 186 *Ga.* 185 (197 S. E. 287). The law of this State, therefore, appears to be well settled that equity will not reform a contract on the ground of mistake, unless it be a mutual one or unless there be a mistake on one side and fraud on the other. In 53 Corpus Juris, p. 948, § 63, it is stated: "In some jurisdictions it is held that the mistake of a draftsman or scrivener, acting by direction of only one of the parties, is a unilateral mistake, and is one which will not warrant reformation." Such appears to be the rule in this State.

With these general rules on reformation stated, how does the case under consideration stand? It is stipulated in the record that the plaintiff, at the time this suit was filed, was totally and permanently disabled, and that he had a policy of insurance of full force and effect issued to him by the defendant, which on its face obligated it to pay the amounts sued for. Such stipulation, of course, made out a prima facie case for the plaintiff; and nothing else appearing, he would have been entitled to prevail. The defendant sought to avoid liability by asking that the contract of insurance be reformed because of an alleged mistake in the preparation of the same with respect to the type of protection it was intended to offer. The defendant contended that both parties intended that the coverage should be for endowment at age 85 with double indemnity in case of accidental death; and that by mistake a rider or supplement was unintentionally attached, providing for benefits in case of total and permanent disability. Therefore this defense against liability was an affirmative one, for an equitable reformation of the contract. To be entitled to such relief, the burden rested upon the defendant to show by clear, unequivocal, and decisive evidence: (1) that, in the preparation of the contract, such a mistake had in fact been made as is relievable in equity; (2) that the defendant had not been so negligent in the execution of the contract or in discovering any mistake which may have appeared therein as to estop it in equity to ask for a reformation; and (3) that it had not been guilty of laches in making its defense for reformation.

With respect to this burden, what does the record show? The answer alleges: "That at the date of the issuance of said policy, through the mistake of a clerk in the office of the defendant in New

York City, N. Y., instead of the slip or supplemental agreement for double indemnity for accidental death requested by the defendant, there was attached to said original policy the supplemental agreement providing for total and permanent disability." Neither in the pleadings nor in the proof is there even so much as a suggestion that the plaintiff had any part in the actual preparation of the contract. The defendant placed full responsibility for the alleged mistake upon its own employee—a typist in its home office at New York. The record is entirely silent as to any mutual mistake in the actual preparation of the contract. Is there in the record, then, such evidence of mistake on the part of the defendant and such fraud on the part of the plaintiff as would justify the direction of a verdict for the defendant on that theory? We think not. The only allegation with reference to fraud on the part of the plaintiff is: "Plaintiff had the policy in his possession during all of the time from November, 1922, until some time in 1941." But with respect to this allegation the evidence is without dispute that on at least three different occasions during that period of time the defendant had actual possession of the policy—once during May, 1923, when the policy was reduced from $5000 to $2500 on application of the insured; again on May 18, 1931, so that a change of beneficiary could be endorsed on the policy, and as testified by plaintiff, "I had a hard time paying the premiums and I borrowed on the policy many times so I could keep up the premiums." In this connection, R. F. Goodson, manager of the defendant's Augusta, Georgia, office, while testifying as a witness for the defendant, said: "We know it [the policy] got to the company three times." It seems very clear to us that the company had ample opportunity, by any degree of diligence, to have discovered any possible mistake made in the execution of the contract. When the policy was returned to the company for the purpose of reducing the amount of coverage from $5000 to $2500, the company had full opportunity to examine the policy, and the very fact that it was returned by the insured for this purpose, we think, completely negatives the contention that he was undertaking in any way to conceal from the company the provisions it actually contained. Conceding that the application made by the insured was for "endowment at age 85 with double indemnity," and that the insurer issued a policy to him for a different type of protection, can it be said as a matter of

law that the retention of such a policy was a fraudulent act on the part of the insured? We think not. It is a matter of common knowledge that insurance companies frequently accept applications for insurance protection, but issue a contract for less protection than that applied for. Then, too, it must be kept in mind that the insured here was a person of foreign birth, had been in this country for only a short time, knew and spoke but little of the English language, and doubtless knew still less about the insurance business. It is, we think, very reasonable to assume that "double indemnity" and "disability insurance," to one so unlearned and uninformed about insurance contracts, might have been synonymous terms. In fact, we seriously doubt if either term had any meaning at all to the insured here. They are simply trade names employed by insurance companies to express different types of insurance protection. "Double indemnity," to one not skilled in the insurance business, could unquestionably have various meanings.

It has been so many times held by this court that it is the duty of one executing a contract to read it that we think it wholly unnecessary to cite the authorities here. In 32 Corpus Juris, p. 1142, § 249, it is stated: "A court of equity usually will not reform a policy in order to relieve a party from a mistake which was the result of his own negligence." In *Newsome* v. *Harrell,* 146 *Ga.* 139 (90 S. E. 855), this court said: "The wrongful conduct of a scrivener, who did not write the contract as instructed, will not relieve the party who directed its preparation, but who failed, through his own negligence, to read it before sending it to the other party, who in good faith accepted it and acted upon it. . . If one signs a written contract without acquainting himself with its contents, he is estopped by his own negligence to ask relief from his own obligation, if there is no fraud or artifice in procuring his signature." It is not contended here by the defendant that any fraud or artifice was practiced by the plaintiff in the execution of the contract involved, but it is conceded that the error was purely a mistake by one of the defendant's employees. A company which receives a written application for a particular type of insurance protection, but issues its policy for a different type and transmits the policy to the applicant through its agent who solicited the business, as was here done, but fails to examine the policy sufficiently to see that it conforms to the application, is certainly not

free from negligence; and a policy of insurance so negligently executed and delivered, when accepted in good faith by the insured and acted upon, becomes a binding obligation of the insurer. To hold that the verdict directed here was proper, it would be necessary to find that the defendant was free from such negligence, and that the plaintiff acted in bad faith when he accepted the policy and acted upon it, and the evidence as a whole does not authorize such a finding.

Has the defendant been guilty of laches to the extent that it would now be inequitable to allow reformation? Unquestionably the evidence did not justify the direction of a verdict that the company had not been so guilty. The record shows that the defendant has waited from November 6, 1922, to February 11, 1942, to assert its right for such equitable relief. In the meantime it has collected all of the premiums fixed by it as due, and frequently has had actual possession of the policy, with ample opportunity to examine it; the insured has grown old and become totally disabled, making it now impossible for him to secure the type of insurance which he insists that he requested; the agent who solicited the contract has died; and the insured is not permitted to testify in his own behalf to transactions or communications solely with such deceased agent of the insurer. The mere lapse of time alone may be sufficient to justify the presumption that the defendant's contention here is not well founded. "Equity gives no relief to one whose long delay renders the ascertainment of the truth difficult, though no legal limitation bars the right." Code, § 37-119. In *Manry* v. *Manry*, 196 *Ga.* 365, 370 (26 S. E. 2d, 706), this court said: "There is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent in the strict sense for another. Each case is to be determined according to its own particular circumstances. Laches is not, like limitations, a mere matter of time, but principally a question of the inequity of permitting the claim to be enforced, an inequity founded on some intermediate change in conditions." In *Aken* v. *Bullard*, 134 *Ga.* 665 (68 S. E. 482), it was said: "A petition by a plaintiff who seeks to reform a deed executed twenty-three years prior to the institution of his suit, on the ground of mutual mistake of the parties as to the meaning and effect of the terms of deed, wherein the plaintiff's knowledge of the terms of the deed at

the time of its execution is not negatived, nor any reason given as an impediment to an earlier prosecution of his claim or to excuse his laches, is properly dismissed on demurrer."

Considering the policy of insurance executed and delivered to the plaintiff nearly twenty years before the suit was brought, together with the stipulation of fact in the record, and the evidence as a whole, a verdict for the defendant was not demanded, if indeed it was authorized, since the burden was on the defendant to show his right for reformation by clear, unequivocal, and decisive evidence.

■ It was not shown by any evidence that the insured had any knowledge of or connived in any way with the insurer for the stated premium rate in the rider, providing that payments for total and permanent disability would be lower than the prescribed rate applicable to other persons. In the absence of such showing, we do not think that the insurer, approximately 19 years after the issuance and delivery of the policy and rider, and on its action to reform the contract for alleged mistake, could lawfully contend that it was not liable because the rate of premium which the company inserted in the face of the rider was lower than its rate-book schedule for such protection, and because this would be a discrimination. The defendant will not now be allowed to benefit by its own wrong, in which the plaintiff was not likewise a wrongdoer.

■ In the cross-bill of exceptions, certain testimony of the plaintiff Yablon is questioned as to its admissibility, the testimony being: "He [E. S. Harter, agent of the company] bring me the policy and everything was all right; the policy that I wanted, the disability policy, and I can't read myself. He brought me the policy and said, 'Everything is all right—what you want.' I tell the truth, I don't feel so good; I can't remember. He showed me the policy, and I can't remember whether he read the policy to me or not, it has been so many years ago. I remember he told me, 'You got the policy what you want,' . . and the man who used to go around collecting told me 'Listen, you got the policy; keep them up and if you get sick before sixty years old, you going to have the protection.'" This last quoted testimony was objected to and excepted to on the grounds: that it would vary the written application; if allowed, it would force the insurance company to

discriminate; the company would not be bound by any knowledge of the agent unless written in the application; it would not be admissible after the death of Mr. Harter; and the alleged conversation between the plaintiff and Mr. Harter, a deceased agent of the defendant company, was inadmissible in view of the stipulation as to the question and answer under No. 15 of part A of the application.

The objection that the testimony would vary the written application is without merit, because, as hereinabove stated, the words "with double indemnity" are not so well understood by the average person, or a person under the circumstances of the plaintiff in this case, as to bind him to the insurance terminology of "payment of twice the amount of the policy in the event of death through accidental means," when the latter defining words did not appear in the application. For the same reasons the plaintiff's answer to question 15 of part A of the application, wherein it is stated "with double indemnity," does not make the testimony inadmissible.

The last words of the portion of the testimony of the plaintiff objected to—to wit, "and the man who used to go around collecting told me, 'Listen, you got the policy; keep them up, and if you get sick before sixty years old, you going to have protection'"—are not shown to be the words of the agent Harter or of any deceased or insane agent of the defendant company, and in the absence of applicable objections to the said portion of such testimony, it was admissible.

The other portion of the testimony of Yablon, insofar as it relates to transactions or communications with E. S. Harter, deceased agent of the defendant corporation, was inadmissible under the provisions of the Code, § 38-1603, which declares: "Where any suit shall be instituted or defended by a corporation, the opposite party shall not be admitted to testify in his own behalf to transactions or communications solely with a deceased or insane officer or agent of the corporation."

Regardless of the portion of the testimony of the plaintiff being inadmissible upon the ground that it was a transaction or communication with a deceased agent of the defendant corporation—and to that extent the judgment on the cross-bill is being reversed—there were sufficient other reasons, as hereinabove pointed out, why it was erroneous to direct a verdict for the defendant.

The exceptions in the portion of the cross-bill dealing with the overruling of special demurrers to paragraphs 17 and 18 of the amendment to the petition are without merit for the reasons previously stated.

*Judgment reversed on main bill of exceptions; reversed in part, and affirmed in part on the cross-bill. All the Justices concur.*