## 35237. ADAMS v. HERCULES, INC.

PER CURIAM.

We granted certiorari to review the Court of Appeals' opinion in *Hercules, Inc. v. Adams,* 150 Ga. App. 223 (257 SE2d 289) (1979), wherein it was held that a company handbook delivered to a new employee when hired, which furnished incomplete information concerning the company's voluntary compensation plan contained in a master employment agreement, would bind the company if it did not contain adequate notice that the employee should consult the agreement. The Court of Appeals held that the issue of adequacy of the notice in the handbook of the existence of a master agreement remained in the case as an issue of fact for the jury, and, therefore, summary judgment for the employee should not have been granted.

At the outset, we specially note the following language from the Court of Appeals: "All parties appear to agree that an additional compensation plan offered by an employer and impliedly accepted by an employee, by remaining in employment, constitutes a contract between them, whether the plan is public or private, and whether or not the employee contributes to the plan. [Cits.]" 150 Ga. App. at 224. The Court of Appeals did not hold that the employee handbook was a contract between Adams and Hercules, but that the master agreement was a contract between them. Accordingly, the Court of Appeals noted the cases on point in other jurisdictions. See Gould v. Continental Coffee Co., 304 FSupp. 1 (S.D.N.Y. 1969); Gallo v. Howard Stores Corp., 145 FSupp. 909 (E.D. Pa. 1956); Davilla v. Court Employment Project, Inc., 383

NYS2d 140 (Civ. Ct. N.Y. 1976); Gillette v. Heinrich Motors, Inc., 390 NYS2d 330 (S. C. N. Y. 1976); Fields v. Western Equipment Co. of Eugene, 469 P2d 779 (S. C. Ore. 1970); Voigt v. South Side Laundry & Dry Cleaners, Inc., 128 NW2d 411 (S. C. Wis. 1964). The construction of the handbook language in these cases, however, has been a matter of law for the courts to decide.

The question in this case, then, as we view it, is whether as a matter of law this handbook fairly put employees on notice of the master agreement, and that such master agreement should be examined to determine the benefits available under it. We hold that it does.

Under Part III of the handbook where the employee benefit plans are described, the following appears: "In addition to earned wages, Hercules has a liberal array of benefits such as Vacations, Holiday Pay, Insurance, *etc.* Hercules also has plans and policies designed to promote employee security, to assist in cases of illness, accident or old age, and to help employees provide for their dependents in case of death. These Benefit Plans should be considered as a base from which employees can build a complete protection plan to fit their individual needs.

"These less common Benefit Plans are presented here *in a very brief form.* Because of the nature of some of these Plans, revisions must occasionally be made. *You may obtain the full details of all Benefit Plans from your Foreman, Supervisor or the Personnel Department.*" (Emphasis supplied.)

This language, even if standing alone, would put the ordinarily prudent person on notice that the complete details were absent from this presentation, and that at least one other source should be consulted for "full details." Despite the record's indication that Adams did not have actual notice of the master agreement, he should have made himself aware of the durational limitation on the "Voluntary Compensation Plan" simply by asking his foreman, supervisor or personnel office for full details as he was instructed he might do. While the handbook made no mention of a time limitation, had this been done Adams could have ascertained that there was a thirteen-week limitation on the employer's promise to pay the difference between his wages and the amount of workers'

compensation benefits while absent from work due to an injury sustained in the course of his employment.

In view of this holding, we reverse Division 1 of the Court of Appeals' opinion. In Division 2, the Court of Appeals declined deciding the issue of whether the employee was bound to follow the grievance procedures provided in the master agreement. Since we have held that Adams should have been on notice that his voluntary compensation benefits were limited to thirteen weeks, and since Hercules has admitted that it owes Adams for thirteen weeks of his disability, this question has been rendered moot.

*Judgment reversed. All the Justices concur, except Jordan, P. J., Nichols and Hill, JJ., who dissent.*

ARGUED NOVEMBER 13, 1979 — DECIDED MARCH 4, 1980 — REHEARING DENIED MARCH 18, 1980.

*George M. Rountree,* for appellant.
*Wallace E. Harrell,* for appellee.

JORDAN, Presiding Justice, dissenting.

I disagree with the majority's holding that the language of this handbook adequately puts its employees on notice that they should consult a "master agreement."

Who wrote this handbook? Hercules did. "If the construction is doubtful, that which goes most strongly against the party executing the instrument, or undertaking the obligation, is generally to be preferred." Code § 20-704 (5).

The majority focuses its attention on one narrow section of the handbook, which is 39 pages in length, in which it is apparently explained to the employee *as a matter of law* that an overall master plan actually controls, while what he is told in the handbook which is furnished to him upon employment is of no consequence at all.

On page one, the handbook states: "This booklet has been prepared to present this information to you in a form that will be readily available for reference. However,

*feel free* to ask your Foreman or Supervisor for information about you and your job at anytime." (Emphasis supplied.) Thirty-four pages later the notice appears that "full details" exist elsewhere, the language cited by the majority. Four pages removed is the following notice: "Voluntary Compensation Plan[:] Hercules pays to an employee absent from work because of an injury sustained in the course of employment, the difference between his normal wages, and the amount of compensation provided by the Georgia Workmen's [sic] Compensation Law. This Plan becomes effective as soon as a person accepts employment with the Company. The entire cost of this Plan is paid by the Company.

"Payments under this Plan will begin immediately to employees who have suffered a tabulable industrial injury. Payments to employees who have suffered a non-tabulable industrial injury will begin after a two-day waiting period.

"Employees receiving payments under this Plan must cooperate fully with the Company in following the advice and directions of the Company Physician."

The "master agreement" provides, however, that "[w]age roll employees who, because of injury or accident arising out of and in the course of their employment, become disabled and unable to work, shall be paid the difference between full wages as defined in the Company's Disability Wage Plan and the amount of temporary total disability compensation provided for by the applicable Workmen's Compensation Law [sic]; if any, and compensation to commence with the third* day of disability and to continue during the period of such disability, *but not in excess of thirteen (13) weeks for any one injury or accident* ... *However, plant managers when authorized by their respective General Managers may, at their discretion, waive the two-day waiting period in those cases where the injury is *tabulable* [emphasis present in original] insofar as lost-time accident records are concerned." (Emphasis supplied.)

Thus, it appears that the only "detail" missing from the handbook description is the existence of the thirteen week limit, with the exception that the discretionary two-day waiting period for a tabulable injury contained in

the "master agreement" is totally in contravention of the "immediately" language of the handbook.

Furthermore, on page 37 of the handbook under the description of the pension plan, the handbook says that a "booklet describing the entire Pension Plan is available upon request in the Personnel Office . . ." and in describing the savings plan, the handbook says that "when you approach eligibility, the Office Manager will explain this Plan to you in detail." Hercules certainly knew how to be specific when it wanted to be.

Therefore, the *only* notice that an employee of Hercules' Brunswick Plant could have of a material limitation on his or her right to recover on the voluntary compensation plan is the language cited by the majority that the employee "may" seek full details of a plan fully spelled out except for the omission of its most important term — the four words "for only thirteen weeks."

The words "full details" are not adequate notice to the employee that another document actually controls the terms of employment set out in the handbook. As was said in Gould v. Continental Coffee Co., 304 FSupp. 1, 2, a case cited by the majority, an employee was not on notice of the existence of a controlling plan when "[p]laintiff was not furnished with a copy of the plan, nor was he given notice as to when and where a copy could be examined." In this case, Adams was not even notified that such a plan existed, much less told when and where he could examine it.

As noted above, Hercules drafted this handbook. It is its fault alone that the notice is unclear. Handbooks of this nature can serve a useful purpose so long as the notice contained in the handbook is concrete, forceful and specific to the effect that the employee must consult the master plan, and that copies of the same are available at a certain time and at a certain place for inspection.

I would not allow a company to mislead an employee in a summarization of their employment agreement about the details of something so vital to an employee — compensation when the employee cannot work — without being clear as a matter of law that the empty but attractive words read by the employee stand for absolutely nothing.

I respectfully dissent.

I am authorized to state that Justice Nichols and Justice Hill join in this dissent.