A04A2004. HOSPITAL AUTHORITY OF HOUSTON COUNTY et al. v. BOHANNON.

(611 SE2d 663)

ELLINGTON, Judge.

William Bohannon filed an action seeking a determination that his health benefits plan provided coverage for a stem cell transplant as treatment for his kidney cancer. Bohannon requested a permanent injunction ordering the defendants[1] to immediately approve and authorize the treatment. After an expedited hearing, the trial court ruled in Bohannon's favor, compelling HHC to cover the treatment. HHC appeals, contending the trial court erred in ruling that HHC was estopped from denying coverage for Bohannon's treatment.

"Under OCGA § 9-11-52 (a), a trial court's findings in nonjury trials shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." (Citation and punctuation omitted.) *Ins. Indus. Consultants v. Essex Investments*, 249 Ga. App. 837, 839 (1) (549 SE2d 788) (2001). In reviewing the decision in a nonjury trial, the appellate court construes the evidence in favor of the judgment and will not disturb the trial court's factual findings if there is any evidence to sustain them. *Enviro Pro v. Emanuel County*, 265 Ga. App. 309, 311 (593 SE2d 673) (2004); *Ins. Indus. Consultants v. Essex Investments*, 249 Ga. App. at 839-840 (1). The trial court's interpretation and application of the law to those findings, however, are subject to de novo review. Id.

Construed in favor of the trial court's ruling, the record shows the following facts. HHC, a hospital authority created by law,[2] operates several healthcare facilities and has hundreds of employees. It provides its employees a health benefits plan which is self-funded for the first $100,000 of each claim. HHC contracts with a third-party administrator ("TPA") to select a network of "preferred providers" and to evaluate and process claims. HHC's TPA also drafts the health benefits plan document, a booklet listing covered services, exclusions, and other material terms, and prints booklets for distribution to plan

---

[1] Bohannon named as defendants the Hospital Authority of Houston County ("HHC"), Houston Healthcare Complex MSO, Inc., Houston Healthcare, Inc., and "Houston Healthcare Group Protection for Employees of Houston Healthcare."

[2] See OCGA § 31-7-70 et seq. (Georgia Hospital Authorities Law).

enrollees. For the relevant calendar year, 2003, Blue Cross served as the plan's TPA.[3]

Bohannon's wife is a long-time employee of HHC and has family coverage under its health benefits plan. In July 2003, Bohannon received a diagnosis of recurrent metastatic renal cell carcinoma. After the standard course of chemotherapy was unsuccessful, Bohannon's prognosis was "grim," and doctors estimated he had less than six months to live. His doctors referred him to Duke Medical Center's bone marrow transplant program. In November, Blue Cross "precertified" Bohannon for an in-patient transplant evaluation. The Duke team recommended that Bohannon receive a "mixed chimerism allogenic stem cell transplant" and found that his son would be a suitable donor. The six-month process, which could cost as much as $250,000, was scheduled to begin the week before Christmas.

On December 1, Bohannon's doctor at Duke requested "preauthorization," a predetermination of benefits for a stem cell transplant for Bohannon's renal cell carcinoma. The decision maker, Blue Cross's medical director, instructed his staff to send Bohannon's request out for peer review, in keeping with Blue Cross's practice of submitting all transplant preauthorization requests to peer review. Blue Cross asked the reviewer to determine if the treatment "represent[ed] the standard of care" for Bohannon's "clinical situation" or if it was "investigational/experimental." The reviewer concluded that the treatment was experimental for renal cell carcinoma. Blue Cross's medical director accepted this analysis and, by letter dated December 18, 2003, notified Bohannon's doctor at Duke that for this reason the procedure was not covered under HHC's health benefits plan.

A Blue Cross case manager advised Bohannon's wife how to appeal the decision. At the end of January 2004, representatives of HHC met with Bohannon and his wife, and they presented evidence supporting their position that the procedure was not experimental. In February, two organizations performed independent reviews of the denial of benefits. Both concluded the procedure did *not* meet Blue Cross's definition of experimental or investigational;[4] one reviewer specifically opined that the transplant was likely to provide a better

---

[3] Blue Cross served as the plan's third-party administrator only for one year. Southern Administrative Services served as the plan's third-party administrator for the preceding year, and Secure Health Plans of Georgia became the plan's administrator effective January 1, 2004.

[4] According to Blue Cross's definition,

> Services which are considered Experimental or Investigational include services which (1) have not been approved by the Federal Food and Drug Administration or (2) for which medical and scientific evidence does not demonstrate that the expected benefits of the proposed treatment would be greater than the benefits of any available standard treatment and that adverse risks of the proposed treatments will not be substantially increased over those standard treatments.

outcome than the standard treatment with fewer risks. Both reviewers noted, however, that under HHC's 2003 plan document the plan provided coverage for the procedure only for certain medical conditions. Bohannon's kidney cancer was not among those for which such transplants were covered. On February 17, 2004, HHC denied coverage on the basis of the limitation of coverage.[5] This was the first time HHC had given that reason for the denial of coverage. Thereafter, Bohannon brought this action seeking to compel HHC to cover the treatment.[6]

In ruling in favor of Bohannon, the trial court found that HHC never made the provisions and coverages of the 2003 plan available to its enrollees and, therefore, that HHC was estopped from denying Bohannon coverage for the stem cell transplant. The court specifically refrained, however, from declaring that the treatment was covered by the plan for any other enrollee. The court also refrained from ruling on whether HHC's benefit plan was covered by The Patient's Right to Independent Review Act, under which Bohannon filed his petition.

1. HHC contends that the treatment for which Bohannon sought benefits was not covered by HHC's health benefits plan, and, therefore, the trial court erred in compelling it to pay for Bohannon's stem cell transplant. In support of its position, HHC argues that Bohannon had at least constructive notice of the limitation of coverage because an insured has a duty to determine the extent of his healthcare coverage, regardless of whether he is in possession of the plan document. In addition, HHC argues that the doctrines of waiver and estoppel cannot be used to expand an insurance policy's coverage to include any risks which have been expressly excluded and that, accordingly, the trial court erred in ruling that HHC was estopped from denying Bohannon coverage.

We note initially that the health benefits plan HHC offers its employees is a contract of adhesion, which has been defined as "a standardized contract offered on a 'take it or leave it' basis and under such conditions that a consumer cannot obtain the desired product or

---

[5] Though it is HHC's conduct which is material to our decision, we take this opportunity to condemn Blue Cross's handling of the preauthorization request. The summary plan description booklet, Blue Cross's own creation which it applied when it received the request, plainly contained a limitation of coverage which would apply regardless of whether the stem cell transplant was deemed "medically necessary" rather than "experimental/investigational." Yet, with a claimant facing death within a matter of months, Blue Cross caused needless delay by slavishly adhering to its policy that transplants were "100 physician review[ed]" for medical necessity without first determining whether even a "medically necessary" transplant would be covered for a patient with the given diagnosis.

[6] Bohannon titled his complaint, "Petition to Enforce Rights Guaranteed by The Patient's Right to Independent Review Act." See OCGA § 33-20A-30 et seq.

service except by acquiescing in the form contract. Such contracts, while permissible, are construed strictly against the drafter." (Citations omitted.) *Walton Elec. Membership Corp. v. Snyder*, 226 Ga. App. 673, 678, n. 6 (487 SE2d 613) (1997). Like an insurance policy, the subject health benefits plan should be construed as reasonably understood by an enrollee. *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. 232 (1) (477 SE2d 390) (1996). "Exceptions, limitations and exclusions to insuring agreements require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." (Citation and punctuation omitted.) Id. at 232-233 (1).

As discussed above, HHC contracted with Blue Cross, as its third-party administrator, to draft and print a plan description booklet for distribution to plan enrollees. While Blue Cross had the responsibility to produce the booklets, however, it did not have the authority to set the terms of the plan. HHC, as a party offering a contract of adhesion, had the responsibility of ensuring that the scrivener it hired, i.e., Blue Cross, wrote the plan document as instructed and did not insert any limitations of coverage or exclusions that HHC had not requested or approved. See *Yablon v. Metro. Life Ins. Co.*, 200 Ga. 693, 708 (2) (38 SE2d 534) (1946).

HHC's director of human resources, who serves as the in-house health benefits plan administrator, testified that HHC did not intend to change the services covered by the plan when it changed TPAs.[7] The witness emphasized that the benefits plan was *HHC's* plan, not the TPA's plan.[8] It is axiomatic that when contract language is substantially rewritten, changes in the parties' respective rights and duties inevitably result. Yet, despite its intention of providing the same benefits from year to year, the record does not show that HHC took adequate steps to ensure that the language used to describe those benefits to plan enrollees did not change.

When HHC hired Blue Cross to be its TPA for 2003, it relied on Blue Cross to supply the language used in the booklets. The only

---

[7] The witness specifically noted that in 2003 and in 2004 the health benefits plan limited coverage for the bone marrow transplants to the same specified conditions, although in 2004 the percentage it paid for covered transplants increased.

[8] Yet, when explaining to Bohannon and his wife that HHC could not voluntarily cover Bohannon's treatment when the plan document did not provide coverage, this witness said,

The portion of the plan document that restricted coverage was under the section of transplants. This section specifically lists what transplants are covered for individual disease processes. **This is determined by our re-insurance carrier, not by Houston Healthcare.** Therefore, your request to amend our plan document is something we are not able to do in this situation.

(Emphasis supplied.)

direction HHC gave Blue Cross regarding benefits to be included in the plan document was contained in a two-page benefits summary which specified by category the covered portion of services (emergency room visits, office visits, wellness services, etc.) and listed a few exclusions (impacted teeth, prescription drugs, radial keratotomy, etc.). In preparing HHC's 2003 booklet, Blue Cross began with its own standard benefit plan document for self-funded plans and then modified it according to HHC's two-page benefits summary. There is no evidence that Blue Cross's standard booklet was identical in all material respects to HHC's 2002 plan document. Further, the evidence showed that HHC did not instruct Blue Cross to base the 2003 plan document on the plan document for 2002 (when a different entity was the TPA and drafted the booklet).

With regard to the limitation of coverage on which HHC ultimately relied to deny coverage, Blue Cross's standard booklet provided that stem cell transplants were covered only for certain listed conditions (not including renal cell carcinoma). Blue Cross retained this provision in the booklet it prepared for HHC after it made HHC's requested modifications. There is no evidence HHC directed Blue Cross to include this specific limitation of coverage in the 2003 booklet. The record even suggests that, until HHC received the two independent review reports, its personnel who were responsible for administering the plan did not realize the stem cell transplant limitation was in the 2003 plan document.[9] Taken as a whole, the record supports an inference that, after HHC unwisely assigned to Blue Cross the task of drafting (as opposed to merely physically assembling and printing) the plan document, Blue Cross inserted into the plan document modifications HHC did not request or authorize.[10]

---

[9] Based on the assumption about the continuity of coverage under the plan, the human resources personnel at HHC directed enrollees with health benefit plan coverage questions to consult the previous year's booklet until the current year's document was available. But during the more than 11 months before Blue Cross finished preparing the 2003 booklet, its personnel did not consult the 2002 booklet when making coverage decisions. Rather, Blue Cross based 2003 coverage decisions on its standard document for self-funded PPO plans. During the same period while Blue Cross applied its standard plan provisions to HHC's enrollees' claims, those enrollees could not obtain a copy of Blue Cross's standard document.

[10] The record is clear that when HHC followed the same practice in the transition from Blue Cross to its successor TPA, the plan document included significant modifications in coverage. By comparing the exclusions contained in the booklet created for 2003 by Blue Cross and the one created by Secure Health for 2004, one sees that some exclusions were substantially modified and entirely new exclusions were added. For example, the 2003 document excluded

[c]are for any condition or injury recognized or allowed as a compensable loss through any Workers' Compensation, occupational disease or similar law, [except that] benefits are provided for actively employed partners and small business owners not covered under a Workers' Compensation Act or similar law, if elected by the group and additional premium is paid.

Further, even if HHC directed Blue Cross to include the subject limitation on coverage for transplants, there is no evidence HHC notified its premiums-paying enrollees of the limitation on coverage.[11] As a party offering a contract of adhesion, it was incumbent on HHC to provide plan enrollees notice of the specific benefits under the contract and to "define any limitations on that coverage in clear and explicit terms." *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. at 232-233 (1). See also *Beynon v. Garden Grove Med. Group*, 100 Cal. App.3d 698 (I) (1980).[12] Cf. *McNair v. Monsanto Co.*, 279 FSupp.2d 1290, 1300-1302 (1) (M.D. Ga. 2003) (forum selection clause ruled enforceable against litigants who had notice of the clause, as evidenced by their signatures beneath a statement "I acknowledge that I have read and understand the terms and conditions of this Agreement and that I agree to them" when the forum selection clause appeared on the back of the one-page form agreement and was the only provision in all capital letters). Based on the foregoing, we find the trial court correctly prevented HHC from denying coverage on the basis of the subject provision contained in the 2003 plan document.

We have reviewed the cases HHC cited in support of its argument that regardless of whether Bohannon was in possession of the plan

---

The 2004 document, on the other hand, more broadly excluded "care and treatment of an injury or sickness that is occupational – that is, arises from work for wage or profit including self-employment." In addition, the 2004 document included several exclusions which had no counterpart in the 2003 document, including "care and treatment billed by a hospital for non-medical emergency admissions on a Friday or a Saturday," "care, treatment, services or supplies not recommended and approved by a physician; or treatment, services or supplies when the covered person is not under the regular care of a physician," "exercise programs for treatment of any condition," "replacement of braces of the leg, arm, back, neck, or artificial arms or legs," and "any loss due to an intentionally self-inflicted injury." There is no evidence HHC notified enrollees of those changes.

[11] HHC did not approve the booklet Blue Cross drafted until December 23, 2003. Because a new TPA's term was beginning a week later, HHC never distributed the customized Blue Cross booklets to plan enrollees. HHC finally provided Bohannon and his wife a copy of the Blue Cross booklet in January 2004 because they were appealing the initial denial of coverage.

[12] In *Beynon*, a health care service plan (a contract of adhesion) contained an arbitration provision which granted the plan and provider of services the unilateral right to reject an arbitration award without cause and to require rearbitration. Id. at 705-706. The enrollee received a pamphlet describing the plan but never received a copy of the master policy. The appellate court concluded that the enrollee was never given notice of the subject provision, even though the pamphlet she received stated that disputes " 'must be submitted to arbitration in accordance with the [master policy].' " Id. at 705, 709 (I). The court discussed public policy recognizing that it is important for health care service plans to give enrollees timely and meaningful notice of arbitration provisions in their contracts. Id. at 708-709 (I). The court observed, "[w]here a contract is adhesive, courts will not enforce a provision which limits the liabilities and duties of the stronger party unless such provisions are clear and conspicuous and will not operate to defeat the reasonable expectations of the weaker party." (Citations omitted.) Id. at 705 (I). Because the contested arbitration provision was so heavily weighted against the enrollee, and because the enrollee had no notice of the provision, the trial court ruled that the provision was not enforceable against the enrollee. Id. at 706, 709 (I).

document he is charged as an insured with knowledge of the details of his coverage. Each of these cases presume that a final, written policy existed before the commencement of the period of coverage such that the insured had the opportunity to review the plan document if he chose to do so. *Adams v. Hercules, Inc.*, 245 Ga. 464, 465 (265 SE2d 781) (1980); *Hart v. Waldo*, 117 Ga. 590, 595 (43 SE 998) (1903) (Candler, J., concurring); *Virginia Mut. Ins. Co. v. Price*, 132 Ga. App. 445, 448 (208 SE2d 314) (1974); *Cherokee Credit Life Ins. Co. v. Baker*, 119 Ga. App. 579, 584 (168 SE2d 171) (1969); *Brown v. Mack Trucks*, 111 Ga. App. 164, 167 (141 SE2d 208) (1965). In this case, however, HHC did not approve the booklet Blue Cross drafted until December 23, 2003, after it had denied Bohannon's request for preauthorization on the basis that the treatment was experimental for Bohannon's condition. Accordingly, the cited cases do not apply to the circumstances presented here.

In addition, we reject HHC's argument that this outcome amounts to an impermissible application of the doctrines of waiver and estoppel.[13] We do not base our decision on a finding that HHC waived an applicable limitation of coverage by first denying the claim on the basis of a different, inapplicable exclusion. Rather, we conclude that HHC cannot enforce a limitation of coverage absent evidence it provided this enrollee notice of the limitation.

The judgment of the trial court is affirmed.

2. Because we uphold the trial court's judgment on the basis discussed in Division 1, supra, it is unnecessary to resolve the alternative arguments advanced by Bohannon as bases for upholding the judgment.

(a) First, we need not resolve the issue of whether Bohannon was entitled to the relief awarded under the Patient's Right to Independent Review Act, OCGA § 33-20A-30 et seq.[14] We are troubled, however, by HHC's position on this issue. HHC claims that the Act does not apply to its benefits plan because HHC, as a political subdivision of the state, cannot be subject to the statutes of the Insurance Code, including the Act.[15] HHC's argument is supported by

---

[13] See *Ballinger v. C & S Bank of Tucker*, 139 Ga. App. 686, 689 (229 SE2d 498) (1976); *St. Paul Fire & Marine Ins. Co. v. Purdy*, 129 Ga. App. 356, 357 (4) (199 SE2d 567) (1973); *Lovett v. American Family Life Ins. Co.*, 107 Ga. App. 603, 607 (131 SE2d 70) (1963).

[14] See OCGA § 33-20A-37 (a) ("A decision of the independent review organization in favor of the eligible enrollee shall be final and binding on the managed care entity and *the appropriate relief shall be provided without delay*.") (emphasis supplied).

[15] See OCGA §§ 31-7-72 (a) (hospital authorities are "a public body corporate and politic"); 33-1-2 (6) (defining "transact," with respect to insurance); 33-1-14 (a) (excluding political subdivisions of the state from jurisdiction of insurance commissioner); 33-3-3 (b) (insurance commissioner cannot authorize political subdivisions of the state to transact in insurance); *Cox Enterprises v. Carroll City/County Hosp. Auth.*, 247 Ga. 39, 42 (273 SE2d 841) (1981) (hospital

the position taken by Georgia's Insurance Commissioner, who publicly advises the many thousands of Georgians who pay "premiums" to self-funded health benefit plans that because "benefit payments are funded directly by the employer rather than an insurance carrier[,] . . . no insurance policy contract exists. . . . This means that your plan of coverage is not subject to the insurance laws of the state of Georgia." When the Georgia General Assembly enacted the Patient Protection Act, OCGA § 33-20A-1 et seq., it made these findings:

> The General Assembly finds and declares that it is a vital government concern that the citizens of the State of Georgia have access to quality health care services and that informed consumers will be better able to identify and select plans that offer quality health care services if they are provided specific information before they enroll in health care plans. As the health care market becomes increasingly dominated by health care plans that use managed care techniques that include decisions as to the appropriateness of care, the General Assembly finds and declares that it is a vital government function to protect patients from managed care practices which have the effect of denying or limiting appropriate care. The General Assembly further finds that it is the public policy of the State of Georgia that physicians and health care providers be encouraged to advocate for medically appropriate health care for their patients.

OCGA § 33-20A-2 (a). In the same act, the General Assembly defined "managed care entity" to include "an insurance company, hospital or medical service plan, hospital, health care provider network, physician hospital organization, health care provider, health maintenance organization, health care corporation, employer or employee organization, or managed care contractor that offers a managed care plan." OCGA § 33-20A-3 (10). Given the breadth of the General Assembly's findings and the definition of "managed care entity," one would expect the Patient Protection Act and the Patient's Right to Independent Review Act would apply to managed care-type plans offered by self-insured employers. Yet, the General Assembly specifically designated the acts to be codified within the Insurance Code, apparently subject to the limits on the Insurance Commissioner's jurisdiction, with the effect of excluding many Georgians from their protection. Ga. L. 1996, p. 485, § 1; Ga. L. 1999, pp. 350, 352, § 3. In adopting regulations to implement the Patient Protection Act, the Insurance

authorities are governmental entities); Ga. Op. Atty. Gen. No. 2002-8 (accord).

Commissioner implied that only licensed insurers can offer managed care plans as defined by the Act. Ga. Comp. R. & Regs. r. 120-2-80-.01 (4). Although it is not necessary to resolve this issue in order to uphold the trial court's judgment, see Division 1, supra, we are concerned about the apparent disparity between the General Assembly's stated intention to protect patients from managed care practices which have the effect of denying or limiting appropriate care and its failure to protect enrollees in benefit plans offered by political subdivisions of the state.

(b) Finally, because we conclude for the reasons given in Division 1, supra, that HHC cannot enforce against Bohannon the provision limiting coverage for stem cell transplants to certain diagnoses, we do not reach the issue of whether the limitation of coverage is ambiguous because of where and how it appears in the plan document.

*Judgment affirmed. Johnson, P. J., Smith, P. J., Miller and Phipps, JJ., concur. Andrews, P. J., and Blackburn, P. J., dissent.*

ANDREWS, Presiding Judge, dissenting.

I respectfully dissent.

Because the health care plan provided by the Hospital Authority of Houston County (HHC) unambiguously excludes coverage for the medical procedure at issue, the trial court erred by ruling that HHC was estopped from denying coverage.

In July 2003, William Bohannon was rediagnosed with recurrent metastatic renal cell carcinoma.[16] It is undisputed that Mr. Bohannon is covered under HHC's managed health care plan (the HHC plan) under family coverage provided to his wife, an HHC employee. After the 2003 rediagnosis, the plan paid for extensive treatment Mr. Bohannon received for his illness at cancer treatment centers at M. D. Anderson Hospital in Houston and at Duke University Medical Center. Unfortunately, these treatments were not able to control or cure the cancer.

In December 2003, Mr. Bohannon sought approval from the HHC plan for coverage of a promising medical procedure known as a mixed chimerism allogeneic stem cell transplant to be performed in the Duke University bone marrow/stem cell transplant program. In 2003, the third-party administrator for the HHC plan was Blue Cross Blue Shield of Georgia. Under its agreement with HHC, Blue Cross drafted documents showing the coverage limits for benefits provided by the HHC plan and made determinations as to whether or not the HHC plan covered various claims for benefits. Although Blue Cross "pre-certified" Mr. Bohannon for testing at Duke University related

---

[16] Mr. Bohannon was diagnosed and treated for renal cell carcinoma in 2001 and thereafter followed with periodic CT scans.

to possible treatment, Blue Cross never gave Mr. Bohannon "pre-authorization" under the HHC plan indicating that there was coverage for the stem cell transplant. After Blue Cross reviewed the claim and a peer review process was completed, Blue Cross determined on December 18, 2003 that the stem cell transplant sought by Mr. Bohannon was not covered by the HHC plan because it was an experimental or investigational treatment, which was excluded from coverage by the plan.

Shortly after Blue Cross made that determination, HHC terminated Blue Cross as the third-party administrator of its plan and hired Secure Health as the new third-party administrator of the HHC plan effective January 1, 2004. At that point, HHC and Secure Health had not yet signed off on a new health care plan document for 2004, so the existing 2003 Blue Cross drafted plan document remained as the HHC plan for the first two months of 2004 and was administered by Secure Health.[17] In January 2004, HHC asked Secure Health to fully review Mr. Bohannon's request for coverage of the stem cell transplant giving no deference to Blue Cross's earlier denial of coverage. Upon review by Secure Health, including additional independent peer review, Secure Health determined that the stem cell transplant was not experimental or investigational as defined by the HHC plan, and therefore the procedure was not excluded from coverage under the plan on that basis. However, Secure Health further determined that the stem cell transplant at issue was otherwise excluded from coverage under the express terms of the HHC plan.

As the Secure Health claim review determined, the HHC plan provides coverage for medically appropriate transplants of the type sought by Mr. Bohannon, but only if the transplant is for the treatment of a condition specifically listed in the HHC plan. Because renal cell carcinoma is not one of the listed conditions, the HHC plan expressly excludes the transplant sought by Mr. Bohannon for that condition. Furthermore, the HHC plan states that no coverage is provided for "[a]ny transplant not specifically listed as covered." Pursuant to the Secure Health claim review, Mr. Bohannon was finally informed by HHC on February 17, 2004 that the HHC plan did not cover the stem cell transplant. In March 2004, Mr. Bohannon filed a petition in the Superior Court of Houston County seeking a ruling that, under the circumstances, the HHC plan was required to provide coverage.

---

[17] The new 2004 Secure Health drafted plan document was agreed to by HHC and Secure Health on March 2, 2004 with no changes in coverage relevant to the stem cell transplant at issue from the 2003 plan document.

After hearing testimony about the claim review process and the denial of coverage, the trial court ruled as follows:

> When the coverage denial on the basis of "experimental/investigational" was made known to . . . [Mr. Bohannon], rather than pursuing some other possible avenue of treatment or financing, [he] sought to appeal the finding of experimental treatment, succeeded in doing so, and now is told that the procedure is simply not in the coverage provided by the plan. This Court will not now allow the plan to stand on such a position at this late date when the provisions and coverages of the plan were never made available and when the life of the patient now hangs in the balance. [HHC] is hereby estopped from denying coverage and must immediately provide for the recommended treatment at Duke Medical Center.

HHC appealed from this ruling. Although there is evidence that Blue Cross mishandled the initial review process and delayed the denial of coverage when Mr. Bohannon deserved a timely and accurate determination, the record clearly shows there was no coverage under the HHC plan for a stem cell transplant to treat renal cell carcinoma. Nothing in the record supports the conclusions reached by the trial court and the majority that HHC was estopped to deny coverage because of the manner in which the claim was denied or because Mr. Bohannon had no notice of coverage limitations under the HHC plan.

When Blue Cross became the third-party administrator for the HHC plan effective January 1, 2003, a health care plan went into effect on that date which provided for coverage benefits and exclusions from coverage under a network of health care providers assembled by Blue Cross. This was the same plan that paid for Mr. Bohannon's treatment in 2003 at M. D. Anderson and Duke University Medical Center. Both HHC and Blue Cross representatives testified that they signed a Group Master Application document in October 2002 by which the basic Blue Cross PPO health care plan was adopted as the HHC plan effective January 1, 2003, except for changes to the basic PPO plan made by HHC and attached to the application. Accordingly, the application with attached changes to the coverages and exclusions set forth in the basic Blue Cross PPO plan were the documents which comprised the 2003 HHC plan. Over the course of 2003, three modifications were made to the HHC plan, none of which had anything to do with coverage for stem cell transplants. Although one of Blue Cross's duties as the third-party administrator was to prepare a booklet for employees summarizing the 2003 HHC plan, the booklet was not finalized until late December 2003 and was

not sent to employees at that time because of the change in third-party administrators. However, before the HHC plan went into effect on January 1, 2003, HHC sent a letter to all its covered employees, including Ms. Bohannon, informing them of the change to the Blue Cross PPO network and various health plan changes, and directing employees with questions about the plan to call the HHC human resources office. Ms. Bohannon testified that she first requested a copy of the written HHC plan after she and her husband received a denial of coverage letter from Blue Cross on December 22, 2003. Pursuant to that request, she received a copy of the Blue Cross prepared booklet, which showed that the HHC plan excluded coverage for stem cell transplants for the treatment of renal cell carcinoma.

The record shows that the HHC plan, whether for 2003 (under Blue Cross) or for 2004 (under Secure Health), unambiguously excluded coverage for a stem cell transplant for the treatment of renal cell carcinoma. Even though the HHC plan was a contract of adhesion written wholly by HHC and its third-party administrator (as the majority notes), the unambiguous provisions of the contract must be applied as written and are not subject to contrary construction by this Court.[18] *Rossville Fed. S & L Assn. v. Ins. Co. of North America*, 121 Ga. App. 435, 438 (174 SE2d 204) (1970); *Nationwide Mut. Fire Ins. Co. v. Tomlin*, 181 Ga. App. 413, 414-416 (352 SE2d 612) (1986). Moreover, the doctrine of estoppel based on the conduct of HHC or its third-party administrator cannot be applied to require coverage for a medical procedure clearly excluded from coverage by the HHC plan. *Caribbean Lumber Co. v. Phoenix Assurance Co. &c.*, 227 Ga. App. 236, 240-241 (488 SE2d 718) (1997). "Neither waiver nor estoppel can be used to create a liability not created by the contract and never assumed by [HHC] under the terms of the [health care plan]." (Citation and punctuation omitted.) *Washington v. Hartford Accident & Indem. Co.*, 161 Ga. App. 431, 432 (288 SE2d 343) (1982). Accordingly, the fact that HHC or Blue Cross may have initially denied coverage for the wrong reason provides no basis for finding that HHC was estopped to deny clearly excluded coverage.

Finally, there is no basis for the majority's conclusion that HHC was barred from enforcing the coverage limitation because Mr. Bohannon had no notice of the limitation or because he was denied an opportunity to review the HHC plan. The record shows that HHC adopted a health care plan with Blue Cross as the third-party administrator effective January 1, 2003. HHC informed its covered

---

[18] Contracts of adhesion – those where one party must take or leave terms written and imposed by the other party – are common and legal, but any ambiguities in the contract are strictly construed against the drafter. *Western Pacific Mut. Ins. Co. v. Davies*, 267 Ga. App. 675, 681, n. 5 (601 SE2d 363) (2004).

employee, Ms. Bohannon, of the existence of the health care plan by letter and told her where she could get information about the plan. Mr. and Ms. Bohannon were clearly aware of the existence of the plan because it paid for extensive cancer treatment received by Mr. Bohannon in 2003. When Ms. Bohannon first asked for information about the HHC plan coverage in December 2003 after coverage was denied, HHC provided the requested information. The rule under these circumstances is that, even if the Bohannons did not have possession of a document explaining the HHC plan coverage until after coverage was denied, they were informed of the existence of the plan and sought to rely on its benefits, so they were charged with knowledge of its contents and limitations. *Brown v. Mack Trucks*, 111 Ga. App. 164, 166 (141 SE2d 208) (1965); *Ga. Farm &c. Ins. Co. v. Owens*, 178 Ga. App. 446, 447 (343 SE2d 699) (1986); *Southeastern Security Ins. Co. v. Empire Banking Co.*, 230 Ga. App. 755, 756-757 (498 SE2d 282) (1998).

Virtually all of the cases applying this long-standing rule deal with contracts of adhesion, whether they be insurance contracts, health care plans, or other contracts drafted and offered without change to employees or the general public. The majority sweeps these cases aside without mentioning them and rules that HHC is estopped from denying clearly excluded coverage because the HHC plan was a contract of adhesion, and HHC did not provide the Bohannons with a copy of the plan showing the specific exclusion until after coverage was denied and they first asked for and received a copy. In support of imposing this new rule on contracts of adhesion, the majority cites to *First Financial Ins. Co. v. American Sandblasting Co.*, 223 Ga. App. 232-233 (477 SE2d 390) (1996). *First Financial* holds only that coverage ambiguities in contracts of adhesion are construed against the drafter, and therefore the drafter "assumes a duty to define any limitations on that coverage in clear and explicit terms." Id. This provides no support for the majority's ruling because the HHC plan unambiguously excluded the coverage sought by Mr. Bohannon. I find no support in Georgia law for the majority's refusal to enforce the unambiguous provisions of the HHC health care plan.

I am authorized to state that Presiding Judge Blackburn joins in this dissent.

DECIDED FEBRUARY 11, 2005 —
RECONSIDERATION DENIED MARCH 10, 2005 — 

*Constangy, Brooks & Smith, Jeffery L. Thompson, William J. Martin II, Frank L. Butler III, Drew, Eckl & Farnham, Richard I. Metzger, Morris, Manning & Martin, Lewis E. Hassett*, for appellants.
*Adams, Jordan & Treadwell, Marc T. Treadwell*, for appellee.